FRANK J. LANGER and WILLIAM LANGER, Plaintiffs v. FARGO MERCANTILE CO., a corporation dissolved, T. A. Quirk, C. O. Follett, and Croil Hunter, directors and trustees of Fargo Mercantile Company, a corporation dissolved; Fargo Mercantile Co., a corporation, T. A. Quirk, C. O. Follett and Croil Hunter, directors of said Fargo Mercantile Co., a corporation, Defendants.

(186 N. W. 104.)

**Corporations — directors of dissolved corporation continuing after expiration of charter held trustees for stockholders.**

1. In an action for an accounting brought by two stockholders in a dissolved corporation against the directors as trustees, where it appeared that the charter of the corporation had expired by limitation; that without actual knowledge of this fact the business was conducted for more than three years in the same manner as before; that dividends were declared and paid from time to time; that upon discovery of the fact that the charter had expired, and that the directors were liable as trustees under § 4567 of the Comp. Laws for 1913, three of the directors, to avoid the expense and sacrifice incident to liquidation, agreed to and did form a new corporation under substantially the same name; that, without notice to the plaintiff stockholders, they caused the assets to be appraised and purchased by the new corporation; that the stock of the new corporation was allotted to stockholders in the old, other than the plaintiffs; and that the defendants caused to be deposited in payment for plaintiffs' stock par value, plus 6 per cent. interest from the date of last dividend, which plaintiffs refused to accept—it is *held*:

Under § 4567 of the Comp. Laws of North Dakota for 1913 the defendant directors became trustees for the stockholders of all the assets of the dissolved corporation.

**Corporations — where business is continued after expiration of charter, dividends distributed held stockholders' property, and not to be applied on liquidation claims to reduce res of the trust.**

2. Where a corporate business is conducted for a period of time after the expiration of the charter without knowledge of that fact, and dividends are declared and distributed in the usual course, such dividends are the property of the stockholders, and are not, by operation of law, applied on liquidation claims to reduce the res of the trust.

**Corporations — good will attaches to corporate business the same as to partnership business, and trustees on dissolution must account therefor.**

18

3. Good will attaches to a corporate business to the same extent as to a partnership business and upon dissolution the trustees must account to the stockholders for its value.

**Corporations — good will of corporation paying large dividends after charter expired held to have substantial value, to be measured in money.**

4. Where the charter of a corporation expires after a long period of prosperity in the conduct of its business, and where for a period of years prior to its termination dividends had been earned and paid greatly in excess of a reasonable rate of interest on the capital invested, the good will has a substantial value, capable of being measured in money.

**Corporations — sale of assets by directors after charter's expiration held voidable at election of stockholders not notified.**

5. Where trustees, without notice to the stockholders or to the cestuis que trustent, appoint appraisers to appraise the assets in their hands, and where they dispose of the same for an inadequate consideration to a new corporation in which they are the principal stockholders, the transaction is voidable at the election of the stockholders not notified.

**Corporations — where charter terminated, and business continued by new corporation taking benefits of good will, a stockholder not notified may follow his property into the new corporation or recover money judgment.**

6. Where, after the termination of the charter, arrangements are made by the trustees whereby the business is continued without interruption by a new corporation, which reaps all of the benefits attaching to the good will, a stockholder, whose liquidation claim has not been satisfied and who is excluded from the new corporation, may follow his property into such new corporation, or, at his option, recover a money judgment for the value of the interest in the old corporation as represented by a like interest in the new.

**Corporations — good will of corporation must be disposed of by its trustees to best advantage for stockholders.**

7. Where the good will is not accounted for by the trustees, and the court, in an action for accounting, is compelled to value it, it must be valued as "if it had been sold in the most advantageous manner and under such circumstances that it would have produced the largest sum for all of the parties interested."

**Corporations — in suit against directors as trustees for accounting services of certified accountants not allowable as costs.**

8. Fees paid to a certified accountant will not be allowed as part of the costs, where his services were principally valuable to one of the parties, and where the facts gathered by him were at all times available to such party from the books which are not shown to have been complex.

Opinion filed Dec. 5, 1921.

Appeal of both parties from the District Court of Cass County, *Cole,* J.

Judgment affirmed.

*Young, Conmy* & *Young,* for defendants-appellants.

"Before there can be ·a de facto corporation, there must be a valid law under which a corporation may be formed, a bona fide attempt to incorporate under it, and an actual exercise of corporate powers." Jennings v. Dark, 92 N. E. 778, 782, 175 Ind. 332; Gillette v. Aurora Ry. Co. 81 N. E. 1005, 1009, 228 Ill. 261; Marshall v. Keach, 81 N. E. 29, 227 Ill. 35; 118 Am. St. Rep. 247; 10 Ann. Cas. 164, citing American Trust Co. v. Minnesota & N. E. R. Co., 42 N. E. 153, 157, Ill. 641; Bushnell v. Consolidated Ice Mach. Co. 27 N. E. 596, 138 Ill. 67; 1 Cook, Stock. Stockh. & Corp. (3d ed. § 234).

"The requisites to constitute a 'corporation de facto' are three: (1) A charter or general law under which such a corporation as it purports to be might lawfully be organized; (2) an attempt to organize thereunder; and (3) actual user of the corporate franchise." Whipple v. Tusworth, 99 S. W. 86, 89, 81 Ark. 391, citing Tulare Irrigation Dist. v. Shepard, 22 Supp. Ct. 531, 185 U. S. 1, 46 L. ed. 773; Clark Corp. 90; Finnegan v. Noerenberg, 53 N. W. 1150, 52 Minn. 239, 18 L. R. A. 778, 38 Am. St. Rep. 552; Stout v. Zulick, 7 Atl. 362, 48 N. J. Law 599; Eaton v. Walker, 43 N. W. 638, 76 Mich. 579, 6 L. R. A. 102; Swartwout v. Michigan Air Line R. Co. 24 Mich. 393; McFarlan v. Triton Ins. Co. (N. Y.) 4 Denio 392; Spring Valley Waterworks v. City of San Francisco, 22 Cal. 434; Mackall v. Cheaspeake & O. Canal Co. 94 U. S. 308, 24 L. ed. 161; 3 Cook Corp. (4th ed.) § 637.

"A corporation, after the expiration of the period fixed .for its existence in the law under which it is organized, is not even a de facto corporation, and its existence as a corporation may be attacked collaterally." Clark v. American Canal Co. (Ind.) N. E. 1083; 1 Clark and Marshall on Corporations, § 82c (4) p. 247, Vol. 2 § 305; Guaga Iron Co. v. Dawson, 4 Blackf 202; Morgan v. Lawrenceburg Ins. Co. 3 Ind. 392, 65 Am. Dec. 768; Broadley v. Rappell, 113 Mo. 545, 32 S. W. 645, 34 S. W. 841, 54 Am. St. Rep. 685; Krutz, v. Paola Town Co. 20 Kan. 491, 24 Pac. 977; Supreme Lodge of Knights of Pythias v. Weller, 93 Va. 605, 25 S. E.

891; Dobson v. Simonson, 86 N. C. 492; No. 15, Sons of Temperance v. Ashton, 92 N. C. 578; Sturges v. Vanderbilt, 73 N. Y. 384; White v. Campbell, 5 Humph. (Tenn.) 38.

"If a corporation is dissolved it ceases to be a going concern and thereafter its good will is of no value. "The act of liquidation destroys the value of such good will as a value separate and apart from the value of the tangible assets.'" Fletcher's Cyclopedia Corporations, Vol. 8, p. 9177, § 5571; Watkins v. National Bank (Kan.) 32 Pac. 914; Rossing v. State Bank (Ia.) 165 N. W. 254.

*W. S. Lauder,* for plaintiffs-appellants.

A trustee may not lawfully deal with the trust property for his own advantage, or for the advantage of the company or corporation in which he has a personal interest. Clendenning v. Hawk, (N. D.) 86 N. W. 114, see pp. 116-117, 10 N. D. 90; Anderson v. First Nat'l. Bank, (N. D.) 64 N. W. 114; McKay v. Williams, (Mich.) 35 N. W. 159; Kimball v. Ranney (Mich.) 80 N. W. 992; King v. Remington et al (Minn.) 29 N. W. 352; Stettnische v. Lamb (Neb.) 26 N. W. 374; Veeder v. McKinley, Lansing Loan & Trust Co. et al (Neb.) 86 N. W. 982; Frazier v. Jenkins, (Kan.) 57 L. R. A. 575; Ferguson v. Gooch Trustee, (Va.) 40 L. R. A. 234; Kindman et al v. O'Connor (Ark.) 13 L. R. A. 490; Moore v. Mandlebaum, (Mich.) 8 Mich. 432; Wormley v. Wormley (U. S.) 5 L. ed. 651; Harding v. Handy, (N. S.) 6 L. ed. 429 (Chief Justice Marshall); Michaud v. Girod (U. S.) 11 L. ed. 1076, see particularly column 2, p. 1098. One of the three leading cases of this country, Richardson v. Jones, (Md.) 22 Am. Dec. 293; Cumberland Coal & Iron Co. v. Sherman, (N. Y.) 30 Barb. 553; Gardner v. Ogden (N. Y.) 78 Am. Dec. 192-22 N. Y. 327; Barnes et al v. Lynch et al (Okla.) Pac. 995; Brunner v. Finley et al (Pa.) 41 Atl. 334; Sage et al v. Culver et al (N. Y.) 41 Atl. 513; Wayne Pike Co. et al v. Hammons et al (Ind.) 27 N. E. 487.

"The State alone can complain of the exercise by a corporation of its franchise beyond the period for which it was organized." Miller v. Newburg etc. Co. 31 W. Va. 836—12 A. S. R. 903; Brady v. Deleware Mut. Ins. Co. 45 Atl. 345 (Del.); Arlington Hotel Co. v. Rector, 124 Ark. 90—186 S. W. 662; Wilson v. Brown, 175, N. Y. S. 688.

The defendants are estopped to deny the corporate character of the old company down to Aug. 13, 1918. It is the settled law of the land that

a corporation transacting business and holding itself out as such, to the public, is estopped to deny its corporate character. It is also settled law that, in the absence of fraud, a person who has contracted or otherwise dealt with an association in such a way as to recognize and, in effect admit its legal existence as a corporation is thereby estopped to deny its corporate existence in any action arising out of or involving such contract or dealing. Wilder Mfg. Co. v. Corn Products Refining Co. 236 U. S. 165; Andes v. Ely, 158 U. S. 312; Wallace v. Loomis, 97 U. S. 146; Rannels v. Rowe, 145 Fed. 296—74 C. C. A. 376; Decatur First Nat'l Bank v. Henry, 49 So. 97 (Ala.); Kansas City So. R. Co. v. McClintock 107 Ark. 48 Ann. Cas. 1914 C 1247; Cal. Fruit Exc. v. Buck, 163 Cal. 223—124 Pac. 824; Kelleher v. Denver Music Co. 48 Colo. 212, 109 Pac. 860; Fish v. Smith, 73 Ky. 379, 84 A. S. R. 161; Henry Gold Min. Co. v. Henry, 25 Idaho 333, 137 Pac. 523; Lincoln Park Chapter R. A. M. v. Swatek, 204 Ill. 228, 68 N. E. 429; Jennings v. Dark, 175 Ind. 332, 92 N. E. 778; Faulkner v. Farmers Produce etc. Co. 170 Ky. 22, 185 S. W. 151; Quincy Canal v. Newcomb, 7 Metc. (Mass.) 276.

The doctrine of estoppel to deny corporate existence, by reason of having contracted with the corporation, is not limited to contracts between the corporation and strangers but applies also in the case of contracts, between a corporation and its stockholders or members. Fish v. Smith, 73 Ky. 379, 84 Am. St. Rep. 161; Gilman v. Drusem, 111 Wis. 400, 87 N. W. 557.

And the foregoing is particularly true where the party, so contracting, has also recognized the existence of the corporation by taking an active part therein as promoter, stockholder, member or officer. Henry Gold Min. Co. v. Henry, 25 Idaho 333, 137 Pac. 523, 14 C. J. § 253.

A trustee may not use or deal with the trust property for his own profit. Also no trustee, so long as he remains in the trust, may undertake another trust adverse in its nature to the interest of his beneficiary in the subject of the trust without the consent of the latter. A trusee may not use the influence which his position gives to obtain any advantage over his beneficiary. In so far as pertains to the assets and business of the new corporation the defendants are involuntary trustees, at least to the extent of plaintiff's property that was taken over by the new company. The following authorities fully sustain our contention. U. S. v. Debell, 142 C. C. A. 284; Nestor v. Gross, 66 Minn. 371, 69 N. W. 39; Rollins v. Mitchell, 52 Minn. 41, 53 N. W. 1020; Henderson v.

Murray, 121 N. W. 214; 39 Cyc. 172 and note 32; 1 Perry on Trusts (5 ed.) chap. 5, 166 et seq; Hammond v. Pennock, 61 N. Y. 145.

"The good will of a business is an asset and cannot be appropriated by majority stockholders." Mapes v. Metcalf, 10 N. D. 601; Cook on Corps. Vol. 2, § 641, p. 1835; Trentman v. Wahrenburg, 65 N. E. 1057, 1060 (Ind.); Merchants Ad. Sign Co. v. Sterling, 57 Pac. 468, 71 Am. St. Rep. 94.

BIRDZELL, J. This is an action by two stockholders against a dissolved corporation and the directors as trustees thereof. The relief sought is a judgment that the individual defendants, the directors, be charged as trustees of the property and assets of the old corporation; that they be required to account for the same; that a sale of the property and assets of the dissolved corporation to a new corporation of similar name be adjudged to be null and void; that the affairs of the old corporation be liquidated according to law; that a receiver, trustee, or trustees, be appointed to conserve the property; that the plaintiffs be permitted to follow their interests in the old corporation by requiring the purchasing corporation to issue to them stock in proportion to their property interests in the old corporation; and for general relief. Upon a motion for the appointment of a receiver the district court denied the application, and from the order an appeal was taken to this court, where the order was affirmed. Langer v. Fargo Mercantile Co. et al., 174 N. W. 90. After the conclusion of the trial on the merits, findings and conclusions were made by the district judge to the effect that the individual defendants became trustees; that no valid sale of the property and assets had been made by them; that the affairs of the dissolved corporation had never been lawfully liquidated; that the plaintiffs might elect, on or before May 20, 1921, whether they would take stock in the new corporation with an accounting for dividends earned after the formation of the new corporation, or take a money judgment for the value of their stock on August 13, 1918, the day of the formation of the new corporation, at $275 per share, with an accounting for profits and earnings to the date of the entry of judgment. The latter option was accepted, and judgment entered accordingly in favor of the plaintiffs for $39,873.10. From this judgment both parties have appealed, and the action is here for trial de novo.

Avoiding, for the present, the statement of any controverted facts,

the following statement is sufficient to convey the situation giving rise to the litigation: In 1895, the Fargo Mercantile Company was organized under the laws of this state with a capital stock of $50,000, for the purpose of conducting a wholesale grocery business at Fargo. The time fixed for the existence of the corporation was 20 years from March 15, 1895, but for all purposes of this litigation the corporation came into existence on April 1, 1895, as evidenced by the corporate seal. The organizers and directors were J. C. Hunter, T. A. Quirk, and C. H. Reineke. Of these, J. C. Hunter retained his connection with the business until his death in October, 1916. T. A. Quirk is still connected with the business, but in 1903 Reineke sold his interest to the defendant C. O. Follett, who succeeded him as director, later becoming vice president and manager. From time to time the stock was increased until the capitalization reached $250,000. The board of directors was also increased in number, and on April 1, 1915, the date of the expiration of the charter, the directors were J. C. Hunter, T. A. Quirk, C. O. Follett, and Croil Hunter. The plaintiff F. J. Langer became a stockholder in March, 1903, purchasing 50 shares at par. He later transferred a portion of this stock to the other plaintiff, William Langer. This stock subsequently shared ratably in increases of the capitalization, whether effected through stock dividends or cash. At dissolution, William Langer owned 100 shares and F. J. Langer 25 shares, the other stock being owned as follows: J. C. Hunter, 1,202 shares, Croil Hunter, 50 shares, H. F. Hunter, 50 shares, T. A. Quirk, 700 shares, and C. O. Follett, 373 shares.

The business was successful from the beginning. The first year it paid a dividend of 8 per cent. During the period of its existence it never paid less than that, and it ran as high as 50 per cent. It averaged for the entire period down to and including 1915 18.39 per cent. The most active managers of the business during the period of its growth were J. C. Hunter and C. O. Follett. After the expiration of the charter, April 1, 1915, the business was conducted the same as it had been before, without knowledge, apparently, on anybody's part, that the charter had expired. Knowledge of this fact was first acquired in the latter part of July, 1918, when the Secretary of State returned the corporation report and check for the filing fee, with the information that the charter had expired. Upon receipt of this information, the defendants Quirk and Follett took steps to organize a new corporation, adopting the name Fargo Mercantile Co. in lieu of Fargo Mercantile Company. Croil

Hunter, who was in a military camp at the time, was consulted, and co-operated in the organization of the new corporation. At this time a memorandum agreement in triplicate was entered into between Quirk, Follett, and Croil Hunter, binding them by mutual promises to form a new corporation for the purpose indicated in the agreement. The agreement recites that the parties had just learned of the expiration of the charter and of their obligations under § 4567 of the Compiled Laws, following which it contains these recitals:

"And whereas the assets of said defunct corporation consists of miscellaneous stock such as is usually carried by a wholesale grocery, and various notes and accounts, all of which could be sold and moneys collected only at some sacrifice and considerable expense by the ordinary process of liquidation; and whereas the parties hereto are desirous of avoiding this sacrifice for themselves and all other stockholders who are entitled to participate in the proceeds of the liquidation: Now, therefore, the parties hereto mutually agree one with the other to form a corporation for the purpose of purchasing the assets of the defunct corporation, and agree to accept and take as the name of the corporation to be formed the same name as the defunct corporation, to wit, Fargo Mercantile Co., and for the protection of such stockholders as are not parties to this instrument, to pay for the assets of said concern, including mercantile stock, notes and accounts, etc., as nearly as may be the true and full value thereof as of the date of the purchase by the proposed corporation."

The articles of incorporation of the Fargo Mercantile Co. dated from August 9, 1918. The property and assets of the dissolved corporation were appraised by appraisers selected by the defendants for the purpose, S. D. Lyon and E. G. Gearey. The appraised value was fixed at $540,332.87. To this amount the defendants, Quirk and Follett, arbitrarily added, in round numbers, $29,000. The new corporation made a written offer to purchase the assets for $569,416.63, to be paid $258,750 in cash and by assuming and guaranteeing outstanding debts amounting to $310,666.63. This offer was accepted by the directors of the dissolved corporation, and settlement was made by delivery of the stock of the new corporation, except that no stock was delivered to the Langers or to H. F. Hunter for their respective interests in the old corporation. Settlement with Hunter was made by means of money advanced by T. A. Quirk, and it was proposed likewise to settle for the Langer shares with money advanced by C. O. Follett. The Langers had not been advised

of the steps taken to organize the new corporation and to dispose of the assets of the old corporation by sale to the new. It seems that the proportionate share of the stock the Langers would have received had they been admitted to the new corporation on the same terms as other stockholders were admitted was assigned to Follett, and that the money furnished by him to be paid to the Langers was deposited in a bank. Notice was then given, and a request made that they send in their old certificates and receive the money deposited. The amount thus deposited was par value, plus 6 per cent. interest from the last dividend paying date. The Langers were first notified of these transactions by registered letters dated August 28, 1918.

During the period of the trusteeship, that is, subsequent to April 1, 1915, three dividends were paid as follows: January 3, 1916, 25 per cent.; January 5, 1917, 28 per cent.; January 6, 1918, 25 per cent., making a total on the Langer stock of $9,750.

Prior to the beginning of this litigation, Follett received, as manager, a salary of $6,000, Croil Hunter, as secretary and treasurer, $3,600, and the defendant, Quirk, no salary. Beginning in January, 1919, salaries were voted to Follett, as manager, $12,000, to Hunter, as secretary and treasurer, $17,000, to Quirk, $9,000—thus increasing the salary account $26,400.

It is the contention of the plaintiffs that the stock was fairly worth $300 per share; that the judgment below does not make sufficient allowance for earnings since August 1, 1918; and that there should be incorporated in the judgment the amount expended by them for the services of an expert accountant. The defendants contend that, as the corporation was automatically dissolved by the expiration of the charter April 1, 1915, the individual defendants then became chargeable as trustees for the property and assets of the corporation, and that the right of the plaintiffs is a right to their share of the property and assets determinable as of that date. The book value of the assets April 1, 1915, is shown to have been $556,426.89, and liability to creditors $264,793.22, making a net book value apportionable to stockholders, $291,633.67 or $116.65 per share. It is shown that, on this basis, the Langer stock was worth $14,581.25. But the book value is not conceded. By appraisement it is reduced, principally, by discounting bills and accounts receivable 25 per cent., so that the net valuation of the Langer stock is given as $9,672 on April 1, 1915. It is contended that the corporation was in reality unwittingly liquidated

through the subsequent transaction of business in the ordinary manner, so that, by January 1, 1916, the indebtedness outstanding on April 1 had been paid, and all that remained to complete the liquidation was to pay to each stockholder the share of the assets due him. It is then shown that this was in fact subsequently done, though without thought of settlement, through the payment of certain amounts as dividends. These payments, it is said, were in reality payments on liquidation claims. In this way, the Langers received $9,750, or $77.50 more than the liquidating value of their stock, on April 1, 1915. By allowing interest, however, it is conceded that on this basis there was owing to the Langers, on April 20, 1921, $928.94. Additional calculations are made by the defendants based upon a theory that the plaintiffs might be entitled to a share of the profits of the business subsequently conducted on an "investor's basis." In arriving at the amount apportionable on this basis, the net earnings, beginning April 1, 1915, are distributed according to the total amount of capital employed in the business—taking credit, however, for the payments actually made on the Langer stock during this period. There would remain due the plaintiffs on this theory $10,731.81. But it is contended that this basis is not equitable to the defendants, as they had assumed the responsibility of management, furnished all the credit and most of the capital with which to produce the earnings. Another contention entering vitally into the judgment is that good will cannot be taken into consideration in estimating or determining the liquidating value of the shares. Without this, it is claimed that no such value as that arrived at by the district court can be supported.

In addition to the contentions of the parties stated above, there are controverted questions relating to the valuation of items in the statement of assets. These contentions involve, principally, the discounting of bills and accounts receivable and the valuation of the real estate.

In the brief of the defendants there is considerable argument directed to the capacity in which they were acting after the expiration of the charter. It seems to be the purpose of this argument to demonstrate that during the period following April 1, 1915, the Fargo Mercantile Company was not a corporation de facto. While it is conceded that the directors were trustees under the statute (§ 4567, C. L. 1913), it is contended that they were nevertheless transacting the business as partners; and, being in law, partners, payments made to stockholders must be considered as applied on liquidation claims. Conceding that the Fargo Mercantile

Company was not, during this period, a corporation de facto, we cannot grant that the stated conclusion follows. Nor can we see wherein any importance attaches to the question as to whether the business was conducted by a de facto corporation or by the defendants as partners. In either event the defendant directors must still be charged as trustees under the statute. Regardless of the capacity in which the business was being conducted, the plaintiffs were entitled to the pro rata share, paid to them the same as all other stockholders. If the business transacted in the name of the Fargo Mercantile Company was in fact and in law a partnership business, it was clearly owned by all of the stockholders, and not merely by the trustees who happened to be most active in the conduct of the business, and any amounts paid to the stockholders from earnings would be rightfully theirs as owners.

The fallacy of the argument that payments made by the trustees subsequent to April 1, 1915, must be applied on liquidation claims of the stockholders is made apparent by considering the consequences that would follow if it were upheld. Every stockholder received like payments, with the result that before the discovery of the fact of dissolution they had all been overpaid on the principal of their liquidation claims, and there remained due to each only a small amount as interest. By the payment of this small amount as interest, the director trustees, according to this argument, would become the owners of the business, and this would be true regardless of the amount of stock owned by persons other than the directors. It needs no argument to demonstrate that trustees may not thus acquire for their own benefit the res of a trust.

The principles of law upon which the defendants are chargeable for the profits made through the handling of the trust property are clear and plain. The Code (Comp. Laws) provides, § 6282, that a trustee may not use or deal with trust property for his own profit or for any other purpose unconnected with the trust in any manner. § 6290 gives to the beneficiary of a trust an option to require the trustee to account for all profits made. The law is well settled, even in the case of surviving partners continuing to use the capital supplied by a deceased partner, that a partner continuing the business becomes chargeable with the proportionate share of the profits during the time it is so used, instead of being liable merely for interest. Washburn v. Goodman et al., 17 Pick. (Mass.) 519; Long v. Majestre, 1 Johns, Ch. (N. Y.) 305; Case v. Abeel, 1 Paige, Ch. (N. Y.) 393. The obligations of trustees continuing a corporate business

beyond dissolution are certainly no less than this. We hold that the trustees were properly chargeable with the profits of the business during the period of the trusteeship, and that the distribution made from time to time in the shape of dividends simply discharged this trust obligation, and did not reduce the res of the trust or the obligation to pay over the principal in the shape of the value of the stock itself.

This brings us to the question of the value of the stock. The principal controversy here concerns the propriety of considering an element of value aside from the credits and tangible assets—the element of good will. It is forcefully argued by the defendants that, as the period of corporate existence had expired and there was no longer any right to conduct the business in a corporate capacity, it had no going concern value; that no value can attach to the good will unless the probability that old customers will resort to the old stand (to use Lord Eldon's expression) is a probability that exists in favor of some one. As the corporation is dead and as the stockholders must be held to have taken their stock with knowledge of the limitation of corporate existence contained in the articles, they have, it is claimed, no interest in any such probability. The business comes to an end when the charter expires, and no stockholder has any interest in any business that may be organized to succeed it, except as he may participate in the new arrangement. This argument is supported by Rossing v. State Bank of Bode, 181 Iowa, 1013, 165 N. W. 254, Green v. Bennett (Tex. Civ. App.) 110 S. W. 108, and appears to be recognized as valid by 8 Fletcher Ency. of Corporations, § 5571. Notwithstanding the logical force of the argument and the authority cited in its support, we cannot agree to its soundness. We can perceive no distinction in this respect between the good will attaching to a business conducted by a corporation and that attaching to a partnership business. A partnership is just as completely dissolved upon the death or withdrawal of a partner as a corporation is by the expiration of its charter or by the voluntary discontinuance of its business through consolidation or otherwise. Partners are just as much bound to anticipate the legal possibilities of dissolution through death of a partner or voluntary withdrawal as are stockholders in a corporation to contemplate a lawful termination of the corporate activities, and such possibilities are in the contemplation of the contracting parties to the same extent in both instances. Yet it is universally held that a partner cannot succeed to

the benefits attaching to the good will without rendering himself accountable to the estate of the deceased partner or to the retiring partner for its value.

A situation in many ways similar to that disclosed on the record in the instant case was presented to the Supreme Court of Wisconsin in the case of Lindemann v. Rusk, 125 Wis. 210, 104 N. W. 119. The facts, briefly stated, are that in 1891 the Bank of Viroqua was organized by the incorporators, Rusk and Lindemann, each taking half of the stock, the charter to continue for 10 years. In 1893 Rusk died. Lindemann from the organization and until the expiration of the charter was in the active management of the bank. In December, 1900, just before the expiration of the charter, Lindemann organized a new bank under the name, "Bank of Viroqua," the stock of which was subscribed for by himself and children. The new bank opened and started business the morning of the day following the expiration of the charter of the old bank, and the Lindemanns, in this manner, secured the benefit of the good will, if any, of the old bank. In an action to secure the complete liquidation of the old bank and compel an accounting, the court, in discussing the element of good will, answered many of the arguments advanced by the defendants in this case. We therefore feel justified in quoting the opinion at length and adopting the holdings as applicable to the case at bar. The court said:

"The trial court found that, at the time the bank ceased to do a going business under its charter, it 'owned and was possessed of a good will, which was of the reasonable value at that time of $16,000,' and held that it had been wrongfully appropriated by William F. Lindemann, the surviving director of the bank, for the benefit of the new bank of Viroqua, organized by himself and his children, and which conducted a banking business in the offices of, and in immediate succession to, the old bank. That a banking corporation may have a good will, which, when acquired, constitutes a species of property, is abundantly supported by authority. Bank of Tomah v. Warren, 94 Wis. 151, 68 N. W. 549; People ex rel. A. J. Johnson Co. v. Roberts, 159 N. Y. 70, 53 N. E. 685; Mitchell v. Read, 84 N Y. 556; Washburn v. Nat. W. P. Co., 81 Fed. 17, 26 C. C A. 312; Wilmer v. Thomas, 74 Md. 485, 22 Atl. 403. Good will is the result of the employment of capital in some established business. It augments its value, and is an incident to the conduct of the enterprise. It exists at the place where the busi-

ness is carried on, and gives value to the enterprise because of the benefits that are likely to come to a successor and which arise from being connected with its reputation. It is this which gives to the opportunity of securing this connection to continue the public patronage in the same respect a commercial value. It is strenuously insisted that the old Bank of Viroqua could not convey good will, for want of power to transfer a place, a name, or tangible assets to which it could attach. It is true the bank might not be able to transfer particular business rooms or offices, but the good will as to the place is not confined to such limits; and it might well attach to this banking business, if continued at offices or rooms in the city of Viroqua other than those formerly occupied by it. It is said the name 'Bank of Viroqua' could not have been transferred by it to be exclusively used by a successor. If the general proposition that a defunct corporation whose affairs are being liquidated and closed up retains no right to the use of a corporate name be granted, yet such is not the situation presented by the facts of this case. We have before us a corporation with an established business, which, under the statutes, was continued for three years from the time it ceased to conduct a going banking business, for the purpose and with power, by its directors and managers, to settle up and liquidate its affairs. Nothing would prevent such officers from transferring to another banking corporation the right to use its name as its successor in business by purchase of its tangible assets and good will and the right to hold itself out to the world as successor to the old bank. The objection that such a course would necessarily include the selling of the liabilities of the old bank seems entirely unfounded, for it would have been entirely feasible to have paid up and settled all liabilities in connection with the new enterprise with probable advantage and convenience to both. That such a course of business is practicable is abundantly shown. The facts of the case show that the Lindemanns organized a new bank under the old name, conducted its business in the offices where the affairs of the old were being liquidated and settled, and practically dealt with the affairs of the old bank as its successor, and thus acquired the benefits of the good will of the old bank. Under these circumstances we find the trial court's conclusion to the effect that the old bank was possessed of a good will at the time Lindemann took possession of its assets is well supported by the evidence. As trustee of the bank's property, with power to liquidate its affairs, it was Lindemann's

duty to dispose of the good will, with the tangible assets of the bank, in the most advantageous manner. He failed to do so, but appropriated it to the use of the new bank organized by himself and children. Bank of Tomah v. Warren, supra; Rowell v. Rowell, 122 Wis. 1, 99 N. W. 473; Slater v. Slater, 175 N. Y. 143, 67 N. E. 224, Mellersh v. Keen, 28 Beav. 453; Williams v. Wilson, 4 Sandf. Ch. 379. Under such circumstances the appropriation of the good will for the benefit of the new bank may be treated as a sale, and will be held valid or voidable at the option of the Rusks, for whom he was fiduciary. Rowell v. Rowell, supra; Harrigan v. Gilchrist, 121 Wis. 127, 99 N. W. 909. Under the rule of these authorities, the beneficiaries may require the new bank to account for the profits realized by it through the wrong of its organizers and owners in appropriating the asset of the good will of the old bank. The facts proven and found by the court sustain the judgment of the trial court in fixing the value of the good will and for the recovery of the profits realized thereon as capital stock of the new bank."

Advantages that give value to the good will of a business developed along the lines of the business in question are readily appreciated in the business world, and their value is capable of being measured in money. This is evidenced by the frequency with which good will is made the subject of contract negotiation. Advantages attaching to the privilege of continuing a business like that in the case before us are well summarized by the Supreme Court of New York in the case of In re Silkman et al., 121 App. Div. 202, 105 N. Y. Supp. 872, where it is said:

"The great part of the sales were upon mail orders, or upon orders obtained by salesmen. The salesmen used cards bearing the name of Thurston & Braidich, and scoured the country, keeping in touch as much as possible with the old customers, while seeking for new. As the business dealt with articles more or less used in food products, it was important that the goods were pure. Is there no difference between a business in such products, established for 20 years in substantially the same place, with a list of 1,100 to 2,000 customers, and bearing the same name, and a new business, started under a different name, having to make its way? The very fact that the business did not depend upon a display of goods emphasizes the importance of the repute and standing of the name. Was there no advantage in a traveling salesman

visiting a customer in Denver and carrying the card of Thurston & Braidich, instead of that of an unknown firm? Was there no advantage in possessing a list of 1,000 consumers who had dealt in the past with Thurston & Braidich, and in seeking a continuance thereof, when the customer knew nothing more than that the same firm sought to sell goods to him? If the writers of mail orders or the foreign customers of Thurston & Braidich did not depend upon the display of goods or on personal contact with the firm in New York, what drew their custom to that business house? Thurston & Braidich certainly had, in the words of Vann, J., supra, 'a name known to the trade.' "

So here the name was known to the trade. To establish its standing in the business world and to acquire its extensive patronage must have required the expenditure of considerable money and effort. This does not come to naught upon the expiration of the charter. Its value belongs to those at whose instance it was created—the stockholders of the old corporation. It can no more be appropriated without compensation than can the value attaching to tangible assets. The expiration of a corporate charter does not make the good will of the business a legitimate subject of appropriation by the most vigilant.

The defendants contend that a distinction must be made which will differentiate the holding in the Wisconsin case of Rusk v. Lindemann, supra, and the Iowa case of Rossing v. State Bank, supra, to the contrary, and that the distinguishing feature is that, under a statute like that existing in Wisconsin, the corporation continues its corporate character for a given time after the expiration of the charter, whereas under § 4567, C. L., N. D., continuing corporate character is not recognized or provided for. It is clear to us that there is no ground for such a distinction. The statute of Iowa likewise recognized the continuance of the corporation (Code Iowa 1897, § 1629), but yet it was there held, as pointed out above and contrary to the Wisconsin decision, that there is no good will to be accounted for upon the expiration of the charter of a bank. It seems obvious to us that the value attaching to the good will of the corporate business at dissolution does not depend in the least for its realization upon statutory recognition or nonrecognition of the continuance of the corporation for the limited purpose of liquidation. Such recognition is only a brief and convenient mode of authorizing or validating transactions which can most readily be conducted in the corporate name. Even under § 4567, C. L., N. D. permission is given to use

the corporate name for certain purposes. The duty of liquidation is the same, in our opinion, under both forms of statutes, and the obligations of directors as trustees are identical. In our opinion, the right of the majority stockholders—much less of the defendants as trustees—to appropriate to themselves the good will or other assets of a corporate business is no greater than the right of the minority to do so. Mason v. Pewabic Mining Co., 133 U. S. 50, 10 Sup. Ct. 224, 33 L. ed. 524. Our conclusion is that neither has such right, but that the directors are chargeable as trustees for the proper disposition of all of the assets, including the good will. Being chargeable as trustees and having in that capacity disposed of the assets, including the good will, to a new corporation of which they are directors, the law holds them to strict accountability, and places upon them the burden of showing fairness and the full adequacy of the consideration. Geddes v. Anaconda Copper Mining Co. et al., 254 U. S. 590, 41 Sup. Ct. 209, 65 L. ed. —, Advance Opinions U. S. Supreme Court, February, 1921, p. 227. They have not sustained that burden in this case. It goes without saying that the defendants had no right to acquire the interest of the plaintiffs in the old corporation at a valuation fixed by themselves, or by appraisers selected by them without notice to the plaintiffs. Mason v. Pewabic Mining Co., supra.

Since under the law the defendants are accountable to the plaintiffs for the value of the good will of the business to the same extent that they are accountable for the other assets of the corporation, we are confronted with the necessity of ascertaining that value. We must confess that the task is difficult beyond that usually experienced in ascertaining facts of a more tangible character. But this difficulty does not render the duty any the less imperative nor, in a case of this character, should it obscure the point of view from which the valuation is to be made. Manifestly, a value estimated according to what the good will would bring if subjected to forced sale would be altogether inequitable. The good will in the instant case has not been subjected to forced sale. On the contrary, it has been so dealt with that those who enjoy it reap the fullest measure of value attaching to it. There was no interruption in the business, and the patrons were not aware that a change had taken place. In view of this, it cannot properly be valued according to what would have been realized under less favorable circumstances. The right viewpoint, we think, in these circumstances is that suggested by Sir John Romilly, Master of

the Rolls, in Mellersh v. Keen, 28 Beav. 453-455, 54 Eng. Reprint, 440-441, when he said:

"The difficulty of ascertaining the value of the good will of a business is very great; it is of a shadowy character, and a very slight thing will increase or diminish its value. I have no doubt that the evidence of the eight or nine bankers, who have said that it was worth nothing, may be perfectly true, in one sense, that nothing could have been more easy than to have sold in such a way that nobody would have given a penny for it. But the court is bound to look at it in this point of view: What would it have produced, if it had been sold in the most advantageous manner and under such circumstances that it would have produced the largest sum for all the parties interested?"

Follett, in the instant case, testified that the business was worth a great deal more than the selling value of the visible property. But the record does not afford a reliable, direct indication of the value. It presents, however, strong circumstantial proof that it had a very substantial value. Among these circumstances we may mention the following: The business was successful and prosperous from the beginning, paying a dividend the first year of 8 per cent. Dividends were paid every year, increasing in amount during the later years. The capital stock was increased from time to time until it reached $250,000. All, or nearly all, this increased capital was paid in from profits through stock dividends. During the later years the corporation had shown ability to earn better than 25 per cent. upon its entire capitalization. For the last seven years prior to January 1, 1918, the net earnings averaged 25 per cent., and for the last five years of the period over 26 per cent. of the capital. The business also showed a steady increase in volume, partly due, no doubt, to the advancing price level; but a well-organized business such as this is able to maintain a fairly certain ratio of net profit on the gross volume of business done. On the whole record, we are impressed that the business was built upon a substantial foundation, and that it possessed such elements of stability as would impart great value to it as a going concern.

The law recognizes certain standards by which to determine the value of the good will as a matter of fact, which standards vary with the elements tending to reflect stability or the lack of it. These will be found discussed and applied in the following cases: In re Silkman, supra; Mellersh v. Keen, supra; Von Au v. Magenheimer et al., 115

App. Div. 84, 100 N. Y. Supp. 659, 126 App. Div. 257, 110 N. Y. Supp. 629; Seaich v. Mason-Seaman Transp. Co., 170 App. Div. 686, 156 N. Y. Supp. 579. In this case, we are of the opinion that it is neither necessary nor helpful to apply any arbitrary formula. The interest of the plaintiffs must be valued as of the time they elected to take a money judgment. The attempted sale of that interest in the manner hereinbefore indicated was voidable as to them, and they, having elected to avoid it, may follow their interest into the new corporation, disregarding the indirect attempt of Follett to purchase it. The plaintiffs, in the beginning, offered to take in settlement of their liquidation claims a proportionate amount of stock in the new corporation, which would have placed them in the same position with respect to the new corporation that the other stockholders occupied. Since the sale was invalid as to them, this proposition offered an entirely equitable solution of the difficulty, and the plaintiffs in asserting it as their right were wholly justified on principles applicable to trust obligations. ·

While it is true, as asserted by counsel for the defendants, that those who organize a new corporation have a right to select whom they will as stockholders, this right, where liquidation and reorganization are involved, presupposes the legal adjustment of liquidation claims in such a manner that the property of no claimant is used to the advantage of those who form the new corporation. The failure thus to effect a valid settlement of the trust obligation and the resulting use of trust property to pay for the stock in the new corporation, leave the beneficiary of the trust, who is the claimant in liquidation, free to follow the res into its converted form. Hence his equity is measured, if he choose, by the value of a proportionate interest in the new corporation. From this certain conclusions follow with respect to the valuation of the assets: First, the Lyon-Gearey appraisement is not applicable, for the assets, as far as these plaintiffs are concerned, were not, in law, sold. The 25 per cent. discount of the bills and accounts receivable upon the theory of a sale of these assets en bloc is not permissible, therefore, as the record shows that the bills and accounts receivable, in connection with the operation of the going business, were worth upwards of 97 per cent. of their face. It also follows that the plaintiffs are entitled to a proportionate share of the earnings until the date of the election to take the money judgment, and from this time forward to the legal rate of interest. They have not participated in the earnings subsequent to

January 1, 1918. In addition, the record shows that the real property, carried on the books at $62,273.54, is, in fact, worth from $30,000 to $40,000 more than its book value. The equitable principles applicable in themselves necessitate the rejection of the defendants' theory of values. Since liquidation was not in fact had, the plaintiffs are not bound by a "liquidation value," but are entitled to follow their property into the more favorable investment.

On the whole record, we are impressed that the stock is not worth as much as plaintiffs contend. Our composite judgment of the value does not vary greatly from that arrived at by the trial court. We have concluded, therefore, that the judgment below should stand.

From the memorandum agreement entered into by Quirk, Follett, and Croil Hunter immediately after the discovery of the expiration of the charter, it is, indeed, reasonably to be inferred that a purpose was entertained by them to fully protect all of the stockholders through the organization of the new corporation, for the portions of the agreement hereinbefore quoted recite their obligations as trustees, the fact that some sacrifice and considerable expense would be incurred by liquidation through the ordinary process, and that to avoid this sacrifice, not only for themselves, but for "all other stockholders," they proposed to form the new corporation "for the protection of such stockholders a·· are not parties to this instrument." This original purpose was apparently departed from, however, before the trial of this action, for the record discloses an attempt on the part of the defendants to value the assets for purposes of satisfying the plaintiffs' claims on a liquidation basis involving the very sacrifices that the carrying out of the agreement was designed to prevent, not only on behalf of those signing it, but on behalf of all other stockholders. This agreement, made before the self interest of some of the defendants was brought into conflict with the equities of the plaintiffs, is a virtual recognition of their rights as we find them to be.

In regard to the plaintiff's contention that they should be allowed to recover, as part of the costs, the fees paid to the certified accountant, we are of the opinion that the contention must be denied. His services were principally valuable to the plaintiffs; the material assembled by him being already within the knowledge and ready grasp of the defendants. As far as this record shows, this information would have been readily available to the plaintiffs had they possessed the requisite

familiarity with the records of the corporation. As stockholders the books were always open to them. The books are not shown to have been complex. We are of the opinion that substantial justice is reflected in the judgment appealed from, and it is in all things affirmed. Both parties having appealed, the order will be "without costs."

CHRISTIANSON, J., concurs.

BRONSON, J., not participating.

GRACE, C. J. (specially concurring). The principles of law applicable to trustees in dealing with property, as well as the legal principles dealing with the subject of the "Good will" of a business, its nature, value, sale, etc., were at great length set forth and fully analyzed in the case of Macfadden v. Jenkins, 40 N. D. 422, 169 N. W. 151, and two provisions of our Code relative to trusts (§§ 6282 and 6283) were there fully analyzed. Also §§ 5465 and 5466 relative to "good will" of a business were thoroughly considered, and a thorough and extended analysis of the subject of good will there made.

Mr. Justice BIRDZELL in his opinion of the case at bar has adduced no different principle of law relative to trusts or the duties of trustees dealing with trust property, nor with reference to the subject of the "good will" than that heretofore announced in the case of Macfadden v. Jenkins, supra.

ROBINSON, J. (dissenting in part.) Without attempting to swell the record by arguing either the law or the facts, I hold that plaintiffs are not entitled to recover for their stock and good will more than $200 a share, with interest from August 13, 1918. That was the full value of the stock, including the good will of the business when the transfer was made to the new company. Assuredly it could not have been sold for a greater amount. If the managers of the new corporation by their work, skill, and personal credit happened to realize a greater profit, it was their own good fortune. They did all the work, took all the risk of loss, while the plaintiffs did nothing and took no risk whatever. As they did not risk any loss, 6 per cent. on their capital is a fair and legal compensation for the use of their money. The defendants could easily have borrowed money at that rate. There is a gross wrong in allowing the plaintiffs to stand by and speculate on the profits of the new com-

pany without incurring any risk of loss. "He who takes the benefit must bear the burden." Code (Comp. Laws) § 7255.