### NAVE–McCORD MERCANTILE CO. v. RANNEY.

Circuit Court of Appeals, Eighth Circuit. November 8, 1928.

No. 7925.

James A. Reed and Murat Boyle, both of Kansas City, Mo. (Massey Holmes, of Kansas City, Mo., and Joseph Morton, William M. Morton, W. B. Norris, and George W. Groves, all of St. Joseph, Mo., on the brief), for appellant.

David A. Murphy, of Kansas City, Mo. (John T. Harding, of Kansas City, Mo., and John S. Leahy and Walter H. Saunders, both of St. Louis, Mo., on the brief), for appellee.

Before KENYON and VAN VALKENBURGH, Circuit Judges, and SANBORN, District Judge.

SANBORN, District Judge. Emma Nave Ranney, as plaintiff, brought this suit in equity against the Nave-McCord Mercantile Company, as defendant, and from a decree in her favor the defendant appeals.

In 1847, Abram Nave and James McCord, brothers-in-law, started a grocery business at Savannah and St. Joseph, Mo., under the name Nave & McCord Mercantile Company. On December 30, 1880, Abram Nave, James McCord, Samuel M. Nave, and Francis Brown formed a corporation of the same name for the purpose of carrying on a wholesale grocery business at St. Joseph, Mo. Its capital stock was $300,000, divided into 3,000 shares, of which Abram and Samuel M. Nave had 1,500 shares, James McCord, 1,470 shares, and Francis Brown 30 shares. On January 16, 1882, Abram Nave conveyed to his sons James M. and Samuel M. Nave 424 shares of his stock and other property in trust for his daughter, the plaintiff, Mrs. Ranney. Each of his children at that time received from him property of the approximate value of $150,000. Abram Nave died in 1898. In January, 1899, a suit was commenced in the circuit court of Buchanan county, Mo., to dissolve the trust created by him in favor of Mrs. Ranney. Without objection from her, the trust was dissolved. She was in Europe at the time. Maurice J. Conway, an employé of the Nave & McCord Mercantile Company, was authorized by her to receive her property from her trustees and to deliver it to her brother, Samuel M. Nave, whom she designated to receive it as her representative. The stock held for her, prior to the dissolution of the trust, was carried on the books of the corporation in the name of James M. and Samuel M. Nave, and continued to be so carried. On December 27, 1899, a meeting of stockholders and directors of the company was held. There were present: James McCord, representing 1,300 shares; Samuel M. Nave, 708 shares; J. M. and S. M. Nave, 424 shares (Mrs. Ranney's stock); E. D. McAllister, 10 shares; J. M. and S. M. Nave, Executors of Estate Abram Nave, 358 shares; J. H. McCord, 200 shares. A resolution was adopted reciting that the stockholders and directors "are desirous of reorganizing and continuing the business of this corporation by transferring all of its tangible assets to a new corporation," and approving the formation of a new corporation to be known as "Nave-McCord Mercantile Company." The directors were authorized to sell the merchandise and real estate of the old company to the new company, when formed, at a price to be agreed upon. Articles of incorporation of the Nave-McCord Mercantile Company were executed and recorded the same day. The purpose of the corporation, as stated in the articles, was to engage in the wholesale grocery business "and also to reorganize and to continue the business now conducted by the Nave & McCord Mercantile Company, a corporation." The incorporators were James McCord, James H. McCord, his son, Samuel M. Nave, and Charles J. Schenecker. James McCord subscribed for 1,600 shares of stock, James H. McCord for 400 shares, Samuel M. Nave for 1,960 shares, and Charles J. Schenecker for 40 shares. The total capital was $400,000, divided into 4,000 shares. On January 24, 1900, a meeting of the board of directors of the Nave & McCord Mercantile Company—which will hereinafter be referred to as the old company—was held. The board consisted of James McCord, Samuel M. Nave, and J. H. McCord, all of whom were present. They authorized the sale of the real estate of the company for $50,000, the sale of the merchandise at inventory prices, and the sale of machinery and equipment of the two buildings owned by the company and sold to the new company, for $9,000. The directors of the new company were the same as the old, with the exception that Charles J. Schenecker was also a director of the new company. On January 25, 1900, the directors and stockholders of the new company, all of whom were present, authorized the purchase of the property of the

old company as authorized by its board. At this time the charter of the old company had one year to run. Mrs. Ranney received no notice of the meetings of the stockholders of the old company. Her stock was voted by J. M. and S. M. Nave in favor of the sale of the assets of the old company to the new company. The sale was consummated and the business of the old company was conducted by the new company at the same place, by the same persons, and without interruption.

It is a little difficult to tell from the record just how Mrs. Ranney's account was carried upon the books of the old company and of the defendant. Apparently, prior to the dissolution of the trust created by her father for her, her account appeared upon the books as the account of J. M. and S. M. Nave. The account continued under this name until February 28, 1900, and then for a short time was carried under the name J. M. and S. M. Nave, trustees. The liquidating dividends due her from the old company were credited to the account, and the account was debited with her withdrawals, either as she made them or at the end of each year. The record does not seem to be entirely clear as to how the account was carried after the death of S. M. Nave, but, in any event, it is conceded that whatever was received and whatever was disbursed for her account appeared upon the books. Her brother S. M. Nave had charge of her affairs until his death in 1901. At that time he was indebted to her in the sum of $55,442.35, money of hers which he had used, plus interest at 4½ per cent. That is the amount determined to be due her from his estate by the probate court, and which was paid to her. He had referred to this indebtedness in his will. Mrs. Ranney, who had come to St. Joseph to adjust this matter, had in her possession, on or about the 23d day of May, 1901, $57,160.21. Her brother had died; she wanted some one to care for her property. She called upon her uncle, James McCord, relative to her affairs. There was at that time to her credit in her account on the books of the new company $47,617.80. She turned over to Mr. Schenecker, who was treasurer, the $57,160.21, and received from him a receipt reading as follows:

"$57,160.21      St. Joseph, Mo., May 29, 1901.

"Received from Mrs. E. N. Ranney, Fifty-seven Thousand One Hundred and Sixty and 21/100 Dollars for credit on account.

"[Signed]

"Nave-McCord Mercantile Company,

"Charles J. Schenecker, Treasurer."

The money of Mrs. Ranney was used largely in the business of the company, and she was credited with about 4½ per cent. interest per annum. Her uncle, James McCord, died in 1903 or 1904. Mrs. Ranney then turned to his son, her cousin, Col. James H. McCord. She wrote him on January 17, 1904: "I am so grateful to you for all your kind offers regarding my affairs and am only too glad to have matters go as before as long as you are content to have it so." Col. James H. McCord died in 1922. Mrs. Ranney, through correspondence with Mr. Conway, treasurer of the defendant company, then learned that her capital had become depleted. There is nothing to show that she received any financial statements prior to that time, except possibly a letter from Col. James H. McCord, of June 15, 1921, which she denies ever having seen. In the spring of 1923, Mrs. Ranney employed Mr. Leahy, an attorney, to investigate her affairs. He received from Mr. Conway a statement of her account with the new company. This showed that there was due her $100,885.30. This amount was turned over to Mr. Leahy for Mrs. Ranney, and he gave a receipt for it. There was an audit of the books on behalf of Mrs. Ranney, and her accountants reached substantially the same figures.

Thereafter this suit was commenced. The bill contains two counts.

By the first count, Mrs. Ranney seeks to charge the new company, as trustee, for such proportion of the value of the good will of the old company, at the time its assets were transferred to the new company, as the amount of stock which she held in the old company bore to its entire capital stock. It is her claim that the good will of the old company had a substantial value, that it was transferred to the new company without consideration, and that the effect of what the directors and stockholders of the old company did was to deprive her of a one-seventh interest in the good will, and that the new company now holds this as trustee for her and is required to account to her for its value with interest from the time that it was received.

By the second count, Mrs. Ranney seeks to charge the new company, as trustee, for the difference between what she claims it undertook to procure for her as interest upon her capital and what she actually received from it as interest.

The trial in the court below resulted in a decree in favor of Mrs. Ranney. She was awarded $21,200, with interest at 6 per cent. from December 31, 1899 (being $34,496.02), making a total of $55,696.02, upon the first count; and $72,979.77, with interest at 6 per cent from December 14, 1923 (being $13,266.-

65), making a total of $86,246.42, upon the second count. The total amount awarded to her under the decree, upon both counts, was therefore $141,942.44.

The trial court has set forth the findings and conclusions upon which the decree is based. After stating the facts with reference to the start of the business by the plaintiff's father and uncle, the history of the trust in her favor and its dissolution, the transfer of the assets of the old company to the new company, the liquidation of her stock at book value, and the fact that all those who had a substantial interest in both companies were her blood relations, the court says with reference to her:

. "Plaintiff had been reared in luxury, had married at an early age and had long ceased to make her home at St. Joseph, Missouri, where the business was located and conducted. Plaintiff claims New York as her legal residence but she actually lived in continental Europe almost continually since the creation of the original Trusteeship. During her residence abroad, funds were supplied her from time to time out of her own income or the capital of her estate through Letters of. Credit provided by defendant. The plaintiff became somewhat dependent upon her brothers, who were originally Trustees for her, and later upon the officers of the defendant, for the control, management and preservation of her estate. She did not seek and was never given, except at rare intervals, any information or instructions in the matter of the details of her affairs."

Again:

"The evidence, on behalf of the plaintiff, tended to show that she was not advised that a new corporation had been formed and that her stock in the old had been liquidated. On the other hand, there was testimony, on behalf of the defendant, that she was so advised and that she so understood when she came to St. Joseph in the year 1901, in response to a cablegram advising of the death of her brother, Samuel M. Nave. On her part, she testified that she relied implicitly upon statements and representations made by the officers of the defendant; that they did not acquaint her with the details of the action that had been taken about one year previously; that since that time she had been absent for the most part in Europe; that during all that time she relied upon such management and preservation of her estate as would serve her best interests, and that the defendant, through its officers, so understood."

On the question as to whether the good will of the old company had an appreciable value at the time the business was taken over by the new company, the court said:

"The testimony was that the business of the company was well established; that it had hundreds of regular and loyal customers and that its profits were uniformly large. The business, by the change mentioned, did not suffer an interruption but continued with scarcely a noticeable change in name. So far as the customers of the business were concerned, there was not a recognized interruption and the same books and the same office force, with identical management, continued in the new corporation. The change amounted to no more than a technical record change. One entity merged its business into another under circumstances which, in the language of the resolution, provided for 'continuing the business of this corporation.'"

The court then found that the value of the good will was $150,000, and that Mrs. Ranney's proportion was a fraction more than $21,000. The court found that Mrs. Ranney had no knowledge of the action of the stockholders and directors in forming a new corporation.

Quoting again from the opinion:

"An examination of the entire record warrants the inescapable impression that the action of the stockholders and directors in forming the new corporation was designed to eliminate plaintiff as a stockholder. Such a course could not be justified upon the ground that the then controlling stockholders and officers were responsible for the prosperous condition of the corporation and that its success was due to their sole efforts. Corporate success was due to Abram Nave and James McCord, the founders of the business.

"The plaintiff was entitled, under the provisions made for her by Abram Nave, to have her interest, including the good will created by him and his associates, protected to her. It would be idle to say that plaintiff voluntarily surrendered this interest. She knew nothing about it. On the contrary, she relied upon the officers and managers of the business to protect her interests. The officers of the corporation must have had knowledge of this sacrifice of plaintiff's rights. The new corporate entity became the beneficiary of such rights and it ought now to be required to yield up to plaintiff an interest that should have been recognized when the company was formed."

The court then determined that, under the circumstances, it would be inequitable to apply the doctrine of laches, pointing out that the plaintiff lived continually abroad, and

that she placed herself in the hands of the officers and managers of the new company, who, for the most part, were related to her by blood; that the situation was such as to lull her into a feeling of security.

On the question raised by the second count of the bill, the trial court reached the conclusion that the new company agreed to invest the money received by it from Mrs. Ranney in 1901, upon terms that would yield to her a reasonable return; that it did from time to time invest a portion of these funds; that it finally commingled these funds with its own and used them in the transaction of its business; that her testimony as to the terms under which she left the money with the defendant is more convincing than the defendant's claim that it was to pay approximately 4½ per cent. interest on $100,000; that, under the circumstances, the defendant should be charged at least 6 per cent. interest, less the amount of interest theretofore paid.

From this decree, the Nave-McCord Mercantile Company appeals. There are many assignments of error. They raise, however, but two main questions so far as the first count is concerned:

1. Is the Nave-McCord Mercantile Company a trustee for Mrs. Ranney to the extent of her share of the value of the good will at the time it took over the assets of the old company?

2. If it is a trustee, has she any right at this time to require it to account to her?

The wrong complained of in the first count is not a wrong done to the old company by the new, but a wrong done to the plaintiff by those who controlled the old company and the new, which resulted in the new company, which they owned, being enriched to the extent of the plaintiff's beneficial interest in the good will of the old company.

It is asserted by the defendant that the cause of action, if any exists, is in the old company. But what cause of action could exist in favor of the old company against the defendant? The proceedings whereby the assets of the one were transferred to the other were regular. There was no legal obligation on the part of the new company to pay full value for the assets of the old. There was no fraud and no mutual mistake so far as the record discloses. The majority stockholders had a legal right to cause the sale of the business and assets of the old company, but they could not do it in such a way as to benefit themselves at the expense of the minority stockholders, without becoming liable for a breach of trust. That the majority stockholders are trustees for the minority is well settled.

In Jones v. Missouri-Edison Electric Co., 144 F. 765, 771, this court, speaking through Judge Walter H. Sanborn, said, referring to the duties of such stockholders:

"Such a majority of the holders of stock owe to the minority the duty to exercise good faith, care, and diligence to make the property of the corporation in their charge produce the largest possible amount, to protect the interests of the holders of the minority of the stock and to secure and deliver to them their just proportion of the income and of the proceeds of the property. Any sale of the corporate property to themselves, any disposition by them of the corporation or of its property to deprive the minority holders of their just share of it or to get gain for themselves at the expense of the holders of the minority of the stock, becomes a breach of duty and of trust which invokes plenary relief from a court of chancery."

See, also, Backus v. Brooks (C. C. A.) 195 F. 452; Union Pac. R. Co. v. Frank (C. C. A.) 226 F. 906, 920.

In Southern Pacific Co. v. Bogert, 250 U. S. 483, 487, 39 S. Ct. 533, 535 (63 L. Ed. 1099), it was said:

"The majority has the right to control; but when it does so, it occupies a fiduciary relation toward the minority, as much so as the corporation itself or its officers and directors. If through that control a sale of the corporate property is made and the property acquired by the majority, the minority may not be excluded from a fair participation in the fruits of the sale."

In Ervin v. Oregon Ry. & Nav. Co. (C. C.) 20 F. 577, 580, appears this language:

"If the majority sell the assets to themselves they must account for their fair value. They cannot bind the minority by fixing their own price upon the assets. A majority have no right to exercise the control over the corporate management which legitimately belongs to them for the purpose of appropriating the corporate property or its avails to themselves, or to any of the shareholders, to the exclusion or prejudice of the others. Brewer v. Boston Theater, 104 Mass. 378, 395; Preston v. Grand Collier Dock Co., 11 Sim. 327; Hodgkinson v. National Live Stock Ins. Co., 26 Beav. 473; Atwood v. Merryweather, L. R., 5 Eq. 464, note."

Speaking of the situation which existed in that case it was said by the court (page 579):

"For the purposes of the demurrers, and assuming the facts alleged in the bill to be true, the case disclosed may be briefly stated as follows: A majority of the stockholders of a corporation resolve to avail themselves of their power as a quorum to sacrifice the

interests of the minority stockholders for their own profit, by dissolving the corporation and selling its property and franchises to themselves at half their real value. This scheme they have carried out, and now retain its fruits. They have thrust out the complainants, the minority, from their position as stockholders, terminating their relations with the corporation as such, and have deprived them from realizing what would belong to them upon a fair disposition and division of the corporate property. The defendant the Oregon Railway & Navigation Company is this majority of stockholders, and the defendant Villard is a privy and confederate in the whole transaction."

It was held that the old company in that case was not a necessary party, and that all other stockholders need not be joined. Quoting further (page 582):

"The theory of the bill is that these defendants, while occupying the fiduciary relation towards the complainants of equitable joint-owners of the property, bought it themselves at an inadequate price, and by unfair means. They are in the position of quasi trustees, who have been guilty of a fraudulent breach of their trust. The right of action in such case is ex delicto, and the tort may be treated as several or joint, and the trustees have no right of contribution as between themselves. Peck v. Ellis, 2 Johns. Ch. [N. Y.] 131; Miller v. Fenton, 11 Paige [N. Y.] 18; Heath v. Erie R. Co. [Fed. Cas. No. 6306], 8 Blatchf. 347; Wilkinson v. Parry, 4 Russ. 272; Franco v. Franco, 3 Ves. 75. * * *

"The complainants occupy substantially the position of creditors of the corporation, seeking to obtain satisfaction of their just claim out of the fund in the hand of the defendants, and having an equitable lien. Such creditors can pursue the fund wherever they can find it, without making the stockholders parties, or bringing in all who are liable to account to the fund or have an interest in its distribution. Hatch v. Dana, 101 U. S. 205 [25 L. Ed. 885]."

The demurrers were overruled. The opinion of the court in the same case, after trial, is found in (C. C.) 27 F. 625. On page 632 is found the following statement: ·

"The minority stockholders are therefore entitled to demand their fair share in the transaction, and to be placed upon terms of equality with the majority. It may be that the property of the old company was not worth more than the sum fixed by the appraisers, estimating its value with a view of the winding up of the corporation; but for several months the property had been used by the defendants in a joint venture with the other property of the new corporation, and its value, at the time of the sale, should be estimated at what the property was worth as then situated. This results from the rule of equity which entitles those whose property has been misapplied by an agent or fiduciary to follow it into any form in which it has been converted, and impress it with a trust whenever its identity can be traced, or, at their election, to recover the value of the property in any form into which it has been transmuted."

See, also, Lindemann v. Rusk, 125 Wis. 210, 104 N. W. 119; Langer v. Fargo Mercantile Co., 48 N. D. 545, 186 N. W. 104; Godley v. Crandall & Godley Co., 153 App. Div. 697, 139 N. Y. S. 236; Id., 212 N. Y. 121, 105 N. E. 818, L. R. A. 1915D, 632.

■ Applying these principles to the situation presented by this record, it is clear that at the time it was proposed to sell the assets and business of the old company to the new, it was not only the duty of the majority stockholders of the old company to fully advise the plaintiff as to what was intended, but also to procure for her her just proportion of the proceeds of any sale of its assets. If she was to be eliminated from a participation in the assets and business which the new company was taking over, it was clearly the duty of the majority stockholders, who were her own relatives, to exercise the highest degree of good faith towards her and to share with her equally all benefits accruing from such sale.

It is claimed that the evidence shows that the majority stockholders did obtain all that the assets and business were worth, but the trial court found to the contrary. The evidence on this point is admittedly conflicting. ■ "It is a well-settled rule governing appellate courts that the findings of fact by a chancellor, although not conclusive upon appeal in equity, are presumptively correct and persuasive. Unless an error has occurred in the application of the law, or a serious mistake has been made in the application of the evidence, or the finding is clearly against the weight of the evidence, such findings will not be disturbed. And this rule is especially applicable when the evidence was heard orally by the chancellor, and he thus had the opportunity to see the witnesses, observe their demeanor while testifying, judge of their candor and intelligence, and thus be able to determine their credibility and the weight to be given to their testimony." United States v. Grass Creek Oil & Gas Co. (C.

C. A.) 236 F. 481, 484; Larson v. Crowther (C. C. A.) 26 F.(2d) 780, 787.

Experts were called to prove that the old company had good will and going concern value at the time of the sale, and other experts were called to prove that it had not. The business of the company had been in existence for some 50 years. Behind it was a long history of successful operation. Its books showed some 1500 customers and an adequate sales and executive force. The court adopted as its estimate of the value of the good will the lowest figure given by any of the experts who testified for the plaintiff, $150,000. We cannot say that this conclusion is not supported by the evidence.

The majority stockholders, then, who owned and controlled the new company, obtained $150,000, for which nothing was paid, or, in other words, by virtue of the transfer of the assets and business which they themselves brought about, they gained $150,000, one-seventh of which, in equity, belonged to the plaintiff. This gain accrued to the new corporation and its stockholders, and they have had it and the benefit of it ever since. There would seem to be no more injustice in requiring the defendant to account for it now than would be involved in requiring any trustee to account for funds in his hands which he had supposed were his own, but found out, upon investigation, belonged to his cestui que trust.

It is claimed, however, by the defendant that the plaintiff had an adequate remedy at law in the nature of an action for conversion. A complete answer to this is that the plaintiff never had any legal title to any part or portion of the good will of the old company, and the new company took from her nothing which in law belonged to her. An equitable title or right is not enough to support an action for conversion. 38 Cyc. 2044–2049; Louisville Trust Co. v. Stockton (C. C. A.) 75 F. 62.

It is also asserted that the plaintiff ratified the sale of the assets and business of the old company. She denies that she ever knew anything about the new company or any change in the situation, but supposed at all times that she had a one-seventh interest in the business. There is testimony directly contradicting her and proof of many circumstances which would have put a prudent man dealing at arm's length upon inquiry and charged him with all knowledge which inquiry would have disclosed. But in this case the lower court was confronted with the fact that the plaintiff was a woman intelligent and educated but entirely devoid of business training and business sense, and completely dependent upon her relatives for the care and preservation of her estate. It is, of course, possible that she may have known of all of these transactions at the time and have acquiesced in them, but the question was a disputed question of fact, and we feel that the conclusions of the trial court that she did not know of these matters are sustained by the evidence.

It is also contended that the plaintiff—because the stock did not stand in her name on the books of the company at the time the transfer was made, but in the name of J. M. and S. M. Nave and was voted by them, and because she had written Conway to turn over her stock to S. M. Nave, her agent and representative—must be held to be estopped from claiming that she did not authorize and is not bound by the transfer. In view of the relationship of all the parties—the dissolution of the trust, the letter to Conway, who turned over the certificates belonging to the plaintiff to S. M. Nave, her brother, the very obvious purpose of the transfer of the business and assets to the new company, which was to place the business in the hands of those active in its management—the inference seems unavoidable that it was known that this stock was her stock; that she had given no authority to S. M. Nave to vote for a sale of the business for book value; nor do we think that any general authority to act for her which she may have given would protect the majority stockholders against a failure on their part to procure for her what she was entitled to upon a sale of the business. There is certainly nothing to indicate that S. M. Nave, in subscribing for stock of the new company, was taking part of it in his name for her, as has been suggested in the brief of the appellant. The purchase by the McCords of the S. M. Nave stock from his widow after his death, a few years after the transfer was made, would seem to negative any such idea.

In fairness, we feel that we ought to say that there is nothing in the record which indicates to our minds that S. M. Nave, James McCord, or Col. James H. McCord ever deliberately intended to deprive the plaintiff of her property or to profit at her expense, but that the wrong of which she complains resulted rather from a failure on their part, when determining what price the new company should pay, to give consideration to the fact that the business and assets of the old company had a value considerably in excess of mere book value. We have no doubt that if the matter of good will had been called

to their attention at the time of the sale, there would have been no occasion for this suit. Good will in 1899 had not reached the same prominence in the business world it has since attained.

It is further asserted that laches will bar the plaintiff from any recovery. It is said the bill does not negative laches. It negatives it to the same extent as the evidence and the findings of the court. If it be true that Mrs. Ranney never knew until after the death of Col. McCord that she had ceased to have an interest in the business—that she never knew that the business and assets had been transferred to the new company for $150,000 less than they were worth—she cannot be held accountable for not having brought a suit before. If she had intrusted her affairs to strangers, it could be said that common prudence would have required that she keep in touch with the handling of them. In this case, however, what reason could she have had to suppose that her matters would not receive the most careful attention? These were her own people—her father had made her brothers trustees of her estate; her uncle was her father's partner; his son, Col. McCord, was her cousin. They were naturally the last persons on earth whose acts she would feel called upon to investigate. She rightfully had far greater confidence in their business judgment than in her own. Unless, therefore, the mere lapse of a long period of time constitutes laches, we do not see how that doctrine can properly be invoked against her.

In the case of Spiller v. St. Louis & S. F. R. Co., 14 F.(2d) 284, 288, this court said, referring to laches:

"Laches is an equitable doctrine, not controlled by or dependent upon statutes of limitation, although courts quite generally consider the time fixed by such statutes in actions at law of like character as having some bearing on the pertinency of the doctrine of laches, or, perhaps more accurately stated, on the burden of proof with respect thereto.

"The applicability of the doctrine of laches is dependent upon the circumstances of each particular case. Galliher v. Cadwell, 145 U. S. 368, 12 S. Ct. 873, 36 L. Ed. 738; Abraham v. Ordway, 158 U. S. 416, 15 S. Ct. 894, 39 L. Ed. 1036; Jackson v. Jackson et al., 175 F. 710, 99 C. C. A. 286; Buchler v. Black et al., 226 F. 703, 141 C. C. A. 459; Taylor v. Salt Creek Consol. Oil Co. et al. (C. C. A.) 285 F. 532.

"Mere lapse of time does not constitute laches. In addition, it must appear that something has occurred that would make it inequitable to grant the relief prayed for. Schwartz v. Loftus et al., 216 F. 320, 132 C. C. A. 464; Minnesota Mut. Inv. Co. v. McGirr et al. (C. C. A.) 263 F. 847, 855; Meyer et al. v. Ritter (C. C. A.) 268 F. 937; Northern Pacific Ry. Co. v. Boyd, 228 U. S. 482, 33 S. Ct. 554, 57 L. Ed. 931; Southern Pac. Co. v. Bogert, 250 U. S. 483, 39 S. Ct. 533, 63 L. Ed. 1099.

"Laches cannot exist as to a party, unless he has legal knowledge of the facts affecting his rights. Galliher v. Cadwell, 145 U. S. 368, 12 S. Ct. 873, 36 L. Ed. 738.

"The doctrine of laches is to assist and not to defeat justice—it is to be determined by considerations of justice. Ide v. Trorlicht, Duncker & Renard Carpet Co., 115 F. 137, 148, 53 C. C. A. 341; Drees v. Waldron, 212 F. 93, 128 C. C. A. 609; Mathieson v. Craven (D. C.) 247 F. 223, 226; Townsend v. Vanderwerker, 160 U. S. 171, 186, 16 S. Ct. 258, 40 L. Ed. 383."

It is, of course, unfortunate that the men who were the most concerned with this matter, and who could have testified of their own knowledge as to what was said and what was done, have nearly all passed from the scene; but that is a matter to be considered in weighing the evidence and determining the facts. Townsend v. Vanderwerker, 160 U. S. 171, 16 S. Ct. 258, 40 L. Ed. 383.

The trial court was right in holding that the doctrine of laches should not be invoked in this case.

We have reached the conclusion, upon the facts as they were found by the trial court, that, as to the first count, the decree must stand.

As to the second count, the trial court determined that the plaintiff had an agreement with the new company for the investment of her funds. This finding is based upon an alleged conversation with her uncle and Mr. Schenecker, secretary and treasurer of the new company, which occurred after her brother's death. Mrs. Ranney could not testify to any conversation with her uncle, James McCord, so that no agreement with him was proven. She said:

"I called on my Uncle James at the place of business of Nave & McCord Mercantile Company. That was in reference to business matters. After that visit I went a second time to that place of business and saw my Uncle James on that second visit. On the occasion of my first visit I did not see anyone other than my uncle. I went to see him. On that second visit I saw Mr. Schenecker. I think he was bookkeeper or cashier perhaps. I had a very short conversation with him.

At that time I had two checks with me. I recall the substance of what he said and what I said.

"Q. Just repeat it.

"A. On the advice of my uncle I took the two checks to Mr. Schenecker and asked him to invest my securities to the best possible advantage; always taking great care that my capital should be kept intact. Mr. Schenecker replied: 'Very well.' I said 'Good-bye' and left.

"Q. Did you give him the checks?

"A. I gave him the checks.

"Q. Did he give you any paper?

"A. He gave me a receipt."

The receipt is hereinbefore set forth. Mr. Schenecker said he received the checks from James McCord, who told him to credit Mrs. Ranney's account with them and pay her 4½ per cent. on $100,000.

Assuming that Mrs. Ranney's statement of the situation is correct, is it sufficient to support the conclusion that the defendant, a wholesale grocery concern, had agreed to invest her money for her? The receipt itself is not evidence of any such agreement, and the statement to Schenecker—which can as well be considered a personal request to him as a proposal to the defendant—is not a substantial basis for a finding that Mr. Schenecker had ever attempted to bind the defendant to any such arrangement as Mrs. Ranney claimed. It must be kept in mind that for several years her account had been kept upon the corporate books by her brother—that her arrangement with her brother was not a corporate one. In fact, there is no testimony, except that referred to, that Mrs. Ranney ever looked to the corporation as her agent or trustee. She stated that she never wrote a letter to it "because the affairs were in the hands of my relatives. They were acting for me. My affairs were in the hands of Samuel Nave until his death; and then James McCord, my uncle; and then after his death my cousin, Col. James H. McCord. After that I had nobody except Mr. Conway. Mr. Conway looked after it in pursuance of the letters I have seen here—my own letters." Again, she said: "After Mr. Samuel Nave died and I came to America I was not very much worried who should take charge of my affairs. I counted upon my uncle, because he was the nearest relative I had and I had perfect confidence in him." She stated that James McCord managed her affairs until his death, and that then Col. James H. McCord managed them as the successor of his father. Upon the death of Colonel McCord, she wrote Mr. Conway: "I have been content and satisfied to leave everything in my Cousin's hands, and now feel I know little of my affairs." Every letter which she wrote, after her brother's death, was to her uncle or her cousin, until they too had gone. Taking her testimony alone, we think it is consistent with only one hypothesis, and that is that she entrusted her funds to the control of her relatives, and that all the defendant had to do with them was as a mere depository and auditor; that if there was any failure on the part of any one to get for her the return she bargained for, it was not the failure of the defendant. In view of our position in this regard, it becomes unnecessary to consider any of the other questions relating to the second count of the bill.

Let the decree be affirmed as to the first count, and reversed as to the second count. Let the court below enter a decree dismissing the second count of the bill for want of equity.