**FIDELITY & DEPOSIT CO. OF MARYLAND
v. FARMERS' BANK OF BATES
COUNTY, MO.**

No. 8779.

Circuit Court of Appeals, Eighth Circuit.
Sept. 8, 1930.

Rehearing Denied Nov. 4, 1930.

See, also, 44 F.(2d) 19.

Leland Hazard, of Kansas City, Mo. (P. E. Reeder, of Kansas City, Mo., and O. W. Littleton, of Baltimore, Md., on the brief), for appellant.

D. C. Chastain, of Butler, Mo. (Cyrus Crane, of Kansas City, Mo., on the brief), for appellee.

Before KENYON, BOOTH, and GARDNER, Circuit Judges.

BOOTH, Circuit Judge.

This is a suit in equity by the Fidelity & Deposit Company of Maryland against the Farmers' Bank of Bates County, Mo., to recover an account of moneys which the Fidelity Company has paid to Bates county, Mo., on a bond given to the county by the county treasurer with the Fidelity Company as surety, the Fidelity Company claiming subrogation to the rights of the county against the bank.

A motion was made to dismiss the first amended bill of complaint, and the motion was granted. A second amended bill of complaint was interposed, and a motion was made to dismiss it. A number of grounds were stated in the motion: First, that upon the face of the bill the court had no jurisdiction; second, that the bill failed to state facts sufficient to constitute a cause of action in equity; third, that the second amended bill of complaint was a departure from the first; fourth, fifth, and sixth, that the cause of action, if any, was barred by the three-year statute of limitations and the five-year statute of limitations of the state of Missouri. A decree was entered dismissing the second amended bill of complaint; and providing that the memorandum, which had been filed upon the dismissal of the first amended bill and similar bills against other defendants, should be refiled in connection with the decree. The memorandum contained this statement: "The defendants have each moved to dismiss the bills upon sundry grounds. All have been considered but the consideration of one is deemed sufficient. This ground of dismissal is that no equity is stated in the bills."

### The Allegations of the Bill.

The second amended bill of complaint (hereinafter called the bill), contains seven counts. The first count alleges as facts, among others, the following: Jurisdiction based upon diverse citizenship; election of Claude A. Morwood in November, 1920, as county treasurer of Bates county, Mo.; qualification as such officer, and service until April 1, 1925; giving of a bond March 9, 1921, by Morwood with appellant as surety in the sum of $44,000, conditioned for the faithful performance by Morwood of his duties as county treasurer; the duty of the county court of the county under the statutes of the state was to select as the official county depository the banking corporation of the county which agreed to pay the highest rate of interest on the funds of the county, and which was otherwise qualified; there were three banking corporations in the county, viz.: Farmers' Bank of Bates County (hereafter called defendant bank), People's Bank, and Missouri State Bank; an unlawful agreement was entered into between said banks not to compete with each other in bidding for the funds of the county, but to induce Morwood as county treasurer to deposit the funds of the county in said banks in approximately equal amounts regardless of which one was selected as the official county depository; the duty of Morwood as county treasurer was to deposit all county funds in his hands in the official depository; Morwood had no authority as county treasurer to deposit county funds in any bank other than the official county depository; the county court duly selected the defendant bank as the official depository of the county funds; it acted as such depository from May 4, 1921, to May 11, 1923; deposits were made by Morwood as county treasurer of the county

funds in the said three banks in approximately equal amounts pursuant to said unlawful agreement; Morwood as county treasurer had no authority to pay out the funds of the county or withdraw the same from the depository except to pay warrants drawn by said county court; he had no authority as county treasurer to pay or withdraw funds of the county except by check drawn by him as county treasurer upon the county depository in favor of the legal holder of such a warrant; defendant bank had knowledge of the authority of Morwood as county treasurer and the limitations thereon; Morwood as county treasurer kept funds of the county on deposit in said defendant bank and credit therefor was entered on the books of the bank in an account entitled, "Claude A. Morwood, County Treasurer of Bates County, Missouri," or in similar words; said bank had knowledge that the funds in said account were the exclusive property of Bates county, that Morwood had no personal right, title, or interest in said funds and no right to dispose of the same except in the manner above stated; Morwood as county treasurer in making all withdrawal of county funds from the bank used official form checks having on the face thereof "Claude A. Morwood, County Treasurer, Bates County, Missouri," and having beneath the signature line the words, "County Treasurer"; Morwood kept in said defendant bank a personal account in his individual name; he deposited county funds in the first instance in the county treasurer's account, and then transferred them from the treasurer's account to his personal account; the personal account of Morwood in said bank was at all times composed entirely of funds transferred from said county funds; no deposit was made by Morwood of personal funds in the county treasurer's account; the county treasurer's account was composed of county funds exclusively; none of the withdrawals or payments, nor any of the transfers or other dealings with the funds of Bates county alleged in this count or in any of the other counts, were for the benefit or use of said Bates county, and it received no use or benefit therefrom; during the period from May 4, 1921, to May 11, 1923, Morwood, without authority and without warrants being drawn by the county court, drew checks on the official forms payable to himself, and defendant bank paid out of the funds of the county the amount of said checks (upwards of $7,000) to Morwood or credited them to his personal and individual account, with knowledge by the bank that the checks

were wrongfully drawn by Morwood in favor of himself, and with knowledge that Morwood was converting the funds represented by said checks; defendant bank and/or Morwood converted the proceeds of said checks to their own use, with full knowledge by defendant bank or with information and knowledge which made it the duty of said bank to inquire into the validity of the withdrawal of said county funds by said checks; defendant bank knew that the funds in the account of the county treasurer belonged solely and exclusively to the county, and that Morwood had no right, title, or interest to them except as county treasurer, and no right to withdraw the same except upon warrants drawn by the county court of Bates county, and knew that the funds of Bates county were trust funds and that Morwood occupied a fiduciary relationship with respect thereto; the wrongful paying out of funds of said county as stated rendered the bank liable as trustee and trustee ex maleficio to Bates county; upon demand by Bates county, plaintiff, as surety upon the official bond of Morwood, paid to said county the amounts paid out as stated by said bank, and received an assignment from said county of all rights, claims, and causes of action which it might have against the bank; it was the duty of defendant bank under the statutes of the state of Missouri to make a statement in duplicate of the amount of interest accrued for each month and of the balance standing to the credit of the county with defendant bank, and to deliver one of said statements to the county treasurer and one to the county clerk of said county; defendant bank failed and neglected to make said monthly reports to the county clerk of said county during the term of office of said Morwood, thereby enabling him to falsify his reports and records and to conceal his defalcations.

Count II alleges as facts: During the period May 4, 1921, to May 11, 1923, Morwood, without authority and without warrants drawn by the county court, drew checks on the official form payable to defendant bank; the bank, knowing that the checks were wrongfully drawn by Morwood, that the bank held no warrants for same, and that Morwood had no right or claim to the county funds and was converting the same, credited the personal account of Morwood with the amounts of said checks, and/or received and converted to its own use the proceeds thereof by applying the same to satisfy the personal debts of Morwood to said bank, or by otherwise disposing of the same; said checks amounted

to $583.50. The general allegations of count I are adopted and made a part of count II.

Count III alleges as facts: During the term of office of Morwood he drew checks, payable to defendant bank, upon the county funds on deposit in said Missouri State Bank and in said People's Bank; said checks were drawn upon the official form of check, and beneath the signature line were the words, "County Treasurer"; the amount of the checks was $460.02; defendant bank, knowing that said checks were wrongfully drawn by Morwood in favor of defendant bank, and that said bank held no warrants for the same, and that Morwood had no claim or right to the county funds represented by said checks, and that Morwood was converting the funds represented by said checks, wrongfully received and accepted said checks and collected the proceeds thereof and credited the personal account of Morwood at said defendant bank, and/or received and converted said proceeds to its own use by applying the same to satisfy the personal debts of Morwood to said defendant bank; defendant bank knew that the checks were drawn upon the accounts in Missouri State Bank and said People's Bank in which the county funds were deposited, and knew said checks represented county funds, and knew that in collecting said checks it was receiving funds belonging exclusively to said county; defendant bank and/or Morwood converted the proceeds of said checks to their own use, of which facts said bank at the time had knowledge, or was in possession of knowledge which made it the duty of said bank to inquire into the validity of the withdrawal of said county funds by said check; said defendant bank knew that Morwood held the funds of Bates county as trustee for said county, and in receiving said funds from Morwood said bank became a trustee and trustee ex maleficio thereof. The general allegations of count I are adopted and made a part of count III.

Count IV alleges as facts: During the term of office of Morwood he drew checks upon the county funds in the Missouri State Bank and in the People's Bank payable to himself individually; said checks were drawn upon the official form and amounted to upwards of $1,500; defendant bank knowing said checks were wrongfully drawn and that Morwood was converting to his own use the funds represented by said checks, wrongfully received and accepted the said checks indorsed by Morwood and credited the amounts to the individual account of Morwood; and said defendant bank negotiated said checks and received the proceeds thereof. Count IV adopts the general allegations of count I, and the allegations in count III that defendant bank had knowledge of the character of the funds in the Missouri State Bank and the People's Bank and that Morwood was converting the same.

Count V alleges as facts: July 26, 1921, Morwood drew a check upon county funds on deposit in defendant bank for $690 payable to defendant bank, using the official form of check, and paid the same over to defendant bank in satisfaction of his personal and private debt to defendant bank; said bank received and accepted the check and the proceeds thereof and applied the same to the personal and private indebtedness of Morwood to said bank; said Morwood and said bank thereby converted the proceeds of said check to their own use. Count V also either adopts or repeats the general allegations in count I.

Count VI alleges as facts: Morwood during his term of office drew checks upon the funds of the county on deposit in said defendant bank payable to Everett Drysdale, an employee of Morwood; Everett Drysdale was not entitled to receive payment out of the funds of the county; defendant bank had knowledge of these facts; the checks so drawn amounted to $625; the defendant bank paid said checks; Morwood and Everett Drysdale converted the proceeds of said checks to their own use, of which fact defendant bank had knowledge or was in possession of information which made it the duty of defendant bank to inquire into the validity of the withdrawal of said funds. Count VI also adopts the general allegations in count I.

Count VII alleges as facts: Morwood during his term of office drew checks upon the funds of said county on deposit in defendant bank payable to the Bank of Amsterdam, a banking corporation; said checks were delivered by Morwood to the Bank of Amsterdam for the purpose of delivering funds to it for its accommodation; Morwood was interested in said Bank of Amsterdam, defendant bank knew this, and that said Bank of Amsterdam was not entitled to receive any of the funds of the county and held no warrant for any of said funds; the amount of the checks so drawn was upwards of $7,000; said Morwood and said Bank of Amsterdam converted the proceeds of said checks to their own use, which facts defendant bank knew or had information, which made it its duty to inquire into the validity of the withdrawals. Count VII adopts the general allegations of count I.

## Summary of the Bill.

The allegations of the various counts summarized are that misappropriations were accomplished by Morwood: (1) By drawing treasurer's checks upon defendant bank to himself and depositing them in his personal account; (2) by drawing treasurer's checks upon defendant bank, payable to the bank, and depositing them in his personal account or by paying his personal debts to the bank therewith; (3) by drawing treasurer's checks upon one of the other banks in which county funds were deposited, payable to himself, and depositing same to his personal account in defendant bank; (4) by drawing treasurer's checks upon one of the other banks in which county funds were deposited, payable to defendant bank, and depositing them to his personal account; (5) by drawing treasurer's checks upon defendant bank, payable to his deputy, which checks were paid by defendant bank with knowledge that the deputy had no right to the money; (6) by drawing treasurer's checks upon defendant bank, payable to the Bank of Amsterdam, in which he was interested, for the purpose of assisting the Bank of Amsterdam, these checks being paid by the defendant bank with knowledge of the facts.

It is specifically alleged that the bank knew that the account from which these various transfers were made contained only county funds, and that the bank knew that by these various methods Morwood was misappropriating these funds. The checks showed on their face that they were drawn by the treasurer upon his account as treasurer, and they were by the bank charged against that account. In some instances the checks ran direct to the bank for the purpose of paying the treasurer's personal indebtedness; in other instances they ran directly to the treasurer. The bill specifically alleged knowledge of the bank to such an extent that it was a participant in these unlawful acts of the treasurer, and in fact, in some instances, at least, it personally profited thereby. The bank was charged with notice that the county treasurer had no authority to appropriate the county funds to his own use, nor to use them to pay the treasurer's personal indebtedness to the bank. He was authorized to disburse these funds on warrants drawn by the order of the county court and not otherwise. In other words, his authority was a limited one. The funds were not Morwood's funds, as the bank well knew. These county funds were transferred to the private account of Morwood during his term of office with great frequency.

## Grounds of Attack on the Bill.

■ It is contended first of all that the trial court had no jurisdiction, since the cause of action alleged is an assigned one, and the assignor and the defendant are both residents of Missouri. 28 USCA § 41(1) is cited in support of this contention. We think the cause of action alleged in the bill is not within the purview of the section: First, because subrogation such as here involved is not an assignment within the section. New Orleans v. Gaines's Adm'r, 138 U. S. 595, 606, 11 S. Ct. 428, 34 L. Ed. 1102; Palmer v. Oregon-Washington R. & N. Co. (D. C.) 208 F. 666. Second, because the section does not apply to suits to recover trust funds. Brown v. Fletcher, 235 U. S. 589, 35 S. Ct. 154, 59 L. Ed. 374; St. Joseph Land Co. v. MacLean, 32 F.(2d) 984, 987 (C. C. A. 8).

Another ground of attack is that the facts alleged do not constitute a cause of action in equity. This was the ground upon which the trial court dismissed the bill.

■ Under this ground defendant bank contends that it was bound by statute and by its bond to pay all checks drawn by Morwood as treasurer to the extent of the county funds on deposit. The statutory provisions relied on are contained in sections 9590, 9591, and 9593, R. S. Mo. 1919. They are set forth in the margin.[1] These statutes simply set out the

[1] "Sec. 9590. Payment of checks at county seat.—It shall be the duty of each and every depository selected under the provisions of this article to provide for the payment at the county seat of said county of all checks drawn by the county treasurer upon the funds of said county, so long as funds of said county shall be in the possession of said depository subject to such checks; and for every failure to pay any such check or checks at the county seat of said county, and at the place designated as hereinafter provided, said depository shall forfeit and pay to the holder of said check ten per cent. of the amount thereof, and the county court may revoke the order making it such depository: Provided, however, the amount of its bid shall not be returned, but shall be forfeited to the county."

"Sec. 9591. Provision for having checks honored at county seat.—If any depository selected by the county court shall not be located at the county seat of said county, said depository shall file with the county treasurer a statement designating the place at said county seat where all checks drawn upon it will be paid, and said depository shall cause every check to be paid upon presentation at the place so designated, so long as the said depository has sufficient funds to the credit of said county applicable to such payment."

"Sec. 9593. Warrants—checks.—It shall be the duty of the county treasurer, upon presentation to him of any warrant drawn by the proper authority if there shall be money enough in the depository belonging to the fund upon which said warrant is drawn and out of which the same is payable, to draw his check as county treasurer upon a county depository in favor of the legal holder of said warrant, and to take up said warrant and charge the same to the fund upon which it is drawn; but no county treasurer shall draw any check upon the

usual and ordinary duties of a county depository. They fall far short of sustaining the contention of defendant bank. It would be a remarkable construction of these statutes to hold that defendant bank—knowing that the county treasurer was, by checks on defendant bank in official form, withdrawing county funds and converting the proceeds to his own use, and by such checks on defendant bank paying his private debts to said bank—nevertheless was bound to pay such checks, and bound to receive the proceeds of such illegal checks in payment of the personal debt of the county treasurer. We think such a construction of these statutes is not tenable.

■ The facts show (and it must be borne in mind that we are here dealing with facts alleged, not with facts proven) that on July 26, 1921, within four months from the commencement of his term of office, Morwood drew a check, using the official form, upon the county funds on deposit in defendant bank, payable to said bank; that said check was given by Morwood and received by the bank in payment of Morwood's private debt to the bank; that the bank had full knowledge of all' the facts. Under such a state of facts it cannot be doubted that the bank was liable to the county for the misappropriation. This appears to be conceded by counsel for defendant bank; but it is said that,the amount of this check was only $690, and that this amount and other amounts similarly received by the bank did not total enough to give the federal court jurisdiction. Such a view of the situation is, we think, too restricted. It is true that the transaction of the $690 check was so palpably wrongful that the defendant bank could not well disclaim knowledge; but the numerous other withdrawals also by Morwood of county funds, not for county purposes and not based upon warrants, set out in the various counts, were equally wrongful with the $690 transaction; and the various counts alleged that such wrongful withdrawals were made with full knowledge by the bank of all the facts, or with such knowledge by the bank as would put it on inquiry as to the validity of the various withdrawals. The very fact that the bank had knowledge of the invalidity of the $690 transaction was sufficient to put it on inquiry as to all subsequent withdrawals, especially if such with-

funds in any depository unless there is sufficient money belonging to said fund upon which said warrant is drawn to pay the same, and no money belonging to said county shall be paid by any depository except upon checks of the county treasurer. * * *"

drawals carried anything suspicious on their face.

■ The case of Bischoff v. Yorkville Bank, 218 N. Y. 106, 112 N. E. 759, L. R. A. 1916F, 1059, was in some aspects quite similar to the case at bar. In that case one Poggenburg, executor of an estate, deposited trust funds to his individual account by checks upon another bank, which were signed by him in the name of the estate; and he afterwards paid from such deposits, consisting wholly of trust funds, a personal indebtedness to the bank of deposit. In holding the bank liable to the estate for the sum so paid and also for subsequent wrongful withdrawals, the court in its opinion said at pages 112, 113, 114 of 218 N. Y., 112 N. E. 759, 761:

"A bank does not become privy to a misappropriation by merely . paying or honoring the checks of a depositor drawn upon his individual account in which there are, in the knowledge of the bank, credits created by deposits of trust funds. The law does not require the bank, under such facts, to assume the hazard of correctly reading in each check the purpose of the drawer, or, being ignorant of the purpose, to dishonor the check. The presumption is, and after the deposits are made remains until annulled by adequate notice or knowledge, that the depositor would preserve or lawfully apply the trust funds. The contract, arising by implication of law, from a general deposit of moneys in a bank is, that the bank will, whenever required, pay the moneys in such sums and to such persons as the depositor shall direct and designate. Although the depositor is drawing checks which the bank may surmise or suspect are for his personal benefit, it is bound to presume, in the absence of adequate notice to the contrary, that they are properly and lawfully drawn. Adequate notice may come from circumstances which reasonably support the sole inference that a misappropriation is intended, as well as directly. * * *

"In the present case Poggenburg paid to the defendant, as his creditor, on June 3, 1908, the sum of $765 from his account with the defendant. The finding of the trial court, supported by the evidence, is that the account at that time was constituted wholly from the trust funds. At that time and through the transaction the defendant knew that Poggenburg had appropriated $765 of those funds for his private benefit. The presumption that he would not thus violate his duty and lawful right—that he would apply the moneys to their proper purposes under the will then ceased to exist. There was ab-

solute proof in the possession of the defendant to the contrary. The defendant had no longer the right to assume that in paying the checks of Poggenburg it was paying the executor's moneys to the executor and not to Poggenburg, the individual, or that Poggenburg would use the moneys lawfully. It had knowledge of such facts as would reasonably cause it to think and believe that Poggenburg was using the moneys of the executor for his individual advantage and purposes. Those facts indicated that the payment to it was not an isolated incident; they indicated, rather, that it was within a method or system. Having such knowledge, it was under the duty to make reasonable inquiry and endeavor to prevent a diversion. Having such knowledge, it was charged by the law to take the reasonable steps or action essential to keep it from paying to Poggenburg as his own the moneys which were not his and were the executor's, and was bound by the information which it could have obtained if an inquiry on its part had been pushed until the truth had been ascertained."

We approve the views thus expressed, and think them peculiarly applicable to the facts in the case at bar.

In Alexander v. Security Bank & Trust Co. (D. C.) 273 F. 258, the court said at page 262:

"It is well settled that a bank has the right to assume that the depositor is acting within his authority, and will deal justly by his principal; but this rule breaks down, or rather, has no application, where a bank, with knowledge of the trust character of a deposit, assists the depositor to misapply it by appropriating it, either by a charge ticket, or through the check of the depositor, to the private obligation owed by the depositor to the bank."

Affirmed on appeal, Security Bk. & Tr. Co. v. Geren (C. C. A.) 288 F. 317.

In Union Stock-Yards Nat. Bank v. Gillespie, 137 U. S. 411, the court said at page 416, 11 S. Ct. 118, 119, 34 L. Ed. 724:

"A bank is not sponsor for all its depositors, although it may know the character of their business. Its relations to its depositors are those of debtor; and, generally, receiving and paying out money on the checks of its depositors, it discharges the full measure of its obligations. It is not ordinarily bound to inquire whence the depositor received the moneys deposited, or what obligation such depositor is under to other parties. It is only when there gather around any deposit, or line of deposits, circumstances of a peculiar nature, which individualize that deposit or line of deposits, and inform the bank of peculiar facts of equitable cognizance, that it is debarred from treating the deposit as that of moneys belonging absolutely to the depositor. We notice, therefore, the peculiar circumstances which cast knowledge upon this bank, in respect to these deposits."

After reciting the facts, the court said at page 423 of 137 U. S., 11 S. Ct. 118, 122:

"Here the beneficial owner was the Gillespies; the legal title was in the Rappals; but, when they deposited with the bank, the latter received the moneys with notice that the beneficial ownership was elsewhere than in the Rappals. It could not in equity take them and cancel their private debt to it."

See also United States v. Butterworth-Judson Corp., 267 U. S. 387, 395, 45 S. Ct. 338, 69 L. Ed. 672; San Diego County v. California Nat. Bank (C. C.) 52 F. 59; Union Stock Yards Nat. Bank v. Moore, 79 F. 705 (C. C. A. 8); Hawkeye, etc., Co. v. State Bank (C. C.) 157 F. 253; Santa Marina Co. v. Canadian Bank of Com. (D. C.) 242 F. 142; Hill v. Fleming, 128 Ky. 201, 107 S. W. 764, 16 Ann. Cas. 840.

The case of Central Nat. Bank v. Conn. Mut. L. Ins. Co., 104 U. S. 54, 26 L. Ed. 693, relied upon by defendant bank, is in accord with the foregoing authorities.

As to the obligation of the defendant bank under its own bond to pay checks drawn by the county treasurer, it is sufficient to say that the bond does not appear in the record, and we therefore cannot determine the obligation of the bank thereunder. Certainly we cannot assume that it was any broader than the obligation under the statutes cited.

Another contention also based on the ground of no equity in the bill is that the bond which the surety company signed for Morwood was a protection to every one against the misconduct of Morwood, i. e., that the defendant bank itself was an obligee; and to allow plaintiff to recover would be to allow the surety on a bond after payment of the debt of the principal to recover against an obligee in the bond. There are several answers to this contention: First, it does not appear in the record that the defendant was an obligee protected by the bond given by Morwood. The bond is not set out in full in the record; and whether the bond was a statutory bond and as such subject to be sued upon by any aggrieved party under section 1008, R. S. Mo. 1919, or merely a common-

law bond protecting the county alone, does not appear. Second, in none of the cases cited by defendant bank in support of this contention (American Bond Co. v. Welts [C. C. A.] 193 F. 978; American Sur. Co. v. Citizens' Nat. Bank, 294 F. 609 [C. C. A. 8]; National Sur. Co. v. Arosin, 198 F. 605 [C. C. A. 8]; Stewart v. Commonwealth, 104 Ky. 489, 47 S. W. 332; American Bond. Co. v. State Sav. Bank, 47 Mont. 332, 133 P. 367, 46 L. R. A. [N. S.] 557), did it appear that the party sued by the surety company participated in or had full knowledge of the misappropriations of the obligor. Third, even assuming that the defendant bank was an obligee, we think public policy requires it to be held that where a surety on a bond has paid a loss sustained by one innocent obligee, caused by the joint wrongful acts of the obligor and another obligee, a cause of action arises in favor of the surety against the obligee participating in the wrongful acts; and that under such circumstances the defense of being an obligee in the bond is not open.

Defendant bank contends still further that there is no equity in the bill under the rules laid down in the case Empire Tr. Co. v. Cahan, 274 U. S. 473, 47 S. Ct. 661, 662, 71 L. Ed. 1158, 57 A. L. R. 921. We are unable to agree with the interpretation placed by counsel for defendant bank on the Cahan Case. There a son with unlimited power of attorney from his father drew checks upon his father's accounts in two banks to his own order or to the order of a third bank, and deposited them in his own private account in the third bank. The checks were signed in the father's name by the son as attorney. The checks were honored by the drawee banks. Subsequently the son drew the funds out of the third bank and applied them to his own use. These transactions went on for two years. It was held that the notice gained from the form of the checks was not sufficient to charge the third bank with knowledge of the misappropriations. There was no showing that the third bank had participated in the wrongdoing of the son or had any knowledge thereof. The opinion of the court expressly states: "The petitioner [the third bank] had no knowledge that the son was misappropriating his father's money and no notice other than what was given by the form of the checks."

While the opinion of the Supreme Court in the Cahan Case expressly disapproved the rule as to notice adopted by the Circuit Court of Appeals of the Second Circuit when the Cahan Case was before that court [9 F. (2d) 713], and possibly inferentially disapproved the similar rule adopted by this court in Oklahoma Bank v. Galion, etc., Co., 4 F. (2d) 337, yet there is nothing in the opinion, in the Cahan Case, as we read it, which shows disapproval of the rule stated in the Bischoff Case, supra. The distinction is clear. In the Cahan Case it was held that the fact of knowledge by the bank that the deposits were funds not owned by the depositor and the fact of knowledge of their withdrawal did not constitute sufficient notice to charge the bank with liability for misappropriation of the funds by the depositor. In the Bischoff Case it was held that such facts and the additional fact of participation by the bank in the funds withdrawn by knowingly accepting payment therefrom of the depositor's debt to the bank did constitute sufficient notice to charge the bank with liability for the amounts so used, and for other amounts subsequently withdrawn and misappropriated by the depositor. We think the facts in the case at bar distinguish it from the Cahan Case and bring it within the Bischoff Case. It is to be further noted that in the Cahan Case the son had an unlimited power of attorney to draw checks. In the case at bar the power of the treasurer was limited and known so to be by the defendant bank.

Another ground on which appellee contends that the bill was rightly dismissed is that the bill was barred by the statutes of limitation of the state of Missouri. Two statutes of limitation are invoked. The three-year period of section 1318, R. S. Mo. 1919, is clearly not applicable, as it applies to public officers only; and the Supreme Court of Missouri has held that county depositories are not public officers. Barrett v. Stoddard County, 246 Mo. 501, 511, 152 S. W. 43; Henry County v. Salmon, 201 Mo. 136, 100 S. W. 20.

Section 1317, R. S. Mo. 1919, the five-year statute of limitation, is also invoked. It is to be noted, however, that on the face of the bill it does not appear that the period of this statute has run. The dates when the checks passed through the banks are not given in the bill, and it cannot be assumed that the dates of the checks govern the commencement of the running of the statute. Again, it may at least be open to question whether the date of settlements between Morwood and the county would not mark the commencement of the running of the statute. Such settlement dates are not given in the bill. Answer and proof are necessary under the circumstances to raise the question of the statute

of limitation. Furthermore, it is alleged in the bill that defendant bank by its acts in wrongfully paying out the funds of the county became a trustee ex maleficio of said funds. The allegation is one of mixed law and fact. If the allegation is true, the statute of limitation would not commence to run on the liability created until the wrong was discovered. Mann v. Bank of Greenfield (Mo. Sup.) 20 S. W. (2d) 502.

There are numerous other grounds of dismissal urged by appellee. One is that the cause of action was barred by laches on the part of the county in not making regular, proper examinations of the account of the county treasurer. A sufficient reason for not sustaining this ground is that it is based upon facts assumed and not in the record. The bill does not disclose that no examinations of the treasurer's accounts were made by the county. On the other hand, the bill does allege that the failure of the defendant bank to make regular, proper returns to the county aided the county treasurer in falsifying his reports and concealing his defalcations. It may be noted here in passing that lapse of time alone does not constitute laches in equity. Nave-McCord Merc. Co. v. Ranney, 29 F.(2d) 383 (C. C. A. 8); K. C. S. Ry. Co. v. May, 2 F.(2d) 680 (C. C. A. 8).

It is further urged that the plaintiff must show superior equities before recovery can be had against defendant bank, and that this is not shown by the bill. The case of American Sur. Co. v. Citizens' Nat. Bank, supra, is cited on this and other points. The facts in that case were that the bank, which was a designated county depository, paid county treasurer's checks, drawn by him in his official capacity on it and other banks, by its cashier's checks and drafts on its New York correspondent. The county treasurer indorsed the names of the payees on the cashier's checks and drafts and converted them to his own use. The bank was held not liable. The court in its opinion said at page 614 of 294 F.:

"It is not claimed that the bank's transactions with Davisson were out of the usual course, that it was not bound to honor the check on presentation by Davisson, that it improperly accepted from him the three checks drawn on the other depositaries, or that there was anything connected with the transactions with him that would arouse suspicion of his unlawful intentions. They were all ordinary transactions, carried on in the usual way."

And again at page 616 of 294 F.:

"The right of subrogation is an equitable right, and where equities are equal the right does not exist and there can be no relief. The bill must show a superior equity in the plaintiff to withstand the attack of a demurrer. There was nothing in the transactions themselves between Davisson and appellee to apprise the latter that the former was engaged in misappropriating funds. It is not claimed that there was."

The dissimilarity between the facts in that case and the facts alleged in the case at bar is so great as not to require further comment. The same thing may be said of the case of National Sur. Co. v. Arosin, supra.

Other grounds urged for dismissal have been considered, but found to be without substantial merit.

We, of course, are not called upon to state, and do not undertake to state, the extent of defendant's liability, or that any liability exists. We simply hold on the facts stated that the court below had jurisdiction; that the bill states a good cause of action; that the bill upon its face does not show that the cause of action is barred by laches or by any statute of limitation.

Our conclusion is that the decree should be reversed, and the case remanded for reinstatement of the bill and for further proceedings. It is so ordered.